STATE OF NORTH CAROLINA v. MARCUS LOIS CARTER, JR.

No. 160A92

(Filed 30 December 1994)

1. **Constitutional Law § 280 (NCI4th)— first-degree murder—motion to proceed pro se—inquiry by court**

   The trial court did not err in a first-degree murder prosecution by allowing defendant to proceed *pro se* where the court followed the mandatory inquiry required by N.C.G.S. § 15A-1242. *State v. Pruitt*, 322 N.C. 600, does not set forth any specific guidelines relating to how the statutorily mandated inquiry must proceed. The critical issue is whether the statutorily required information has been communicated in such a manner that defendant's decision to represent himself is knowing and voluntary; Judge Griffin's inquiry elicited the required information and was therefore sufficient for him to determine that defendant's decision was both knowing and voluntary.

   **Am Jur 2d, Criminal Law §§ 764 et seq., 993 et seq.**

   **Accused's right to represent himself in state criminal proceeding—modern state cases. 98 ALR3d 13.**

2. **Jury §§ 205, 197 (NCI4th)— first-degree murder—jury selection—excusals for cause—acquaintance with defendant or relative—pregnant juror**

   The trial court did not err in a first-degree murder prosecution by excusing for cause two prospective jurors after making its own inquiry of them and deciding that they could not be fair and

STATE v. CARTER

[338 N.C. 569 (1994)]

impartial because of their prior acquaintance with defendant or a relative of defendant, and one prospective juror who was in her eighth month of pregnancy and who had indicated that she could go into labor if the trial lasted more than two weeks.

**Am Jur 2d, Jury §§ 265 et seq., 313 et seq.**

**3. Jury § 260 (NCI4th)— first-degree murder—jury selection—peremptory challenges—racially neutral**

There was no error during jury selection in a first-degree murder prosecution where the defendant contends that the State exercised its peremptory challenges to exclude black jurors on the basis of race in violation of *Batson v. Kentucky*, 476 U.S. at 89, but the prosecutor voluntarily gave reasons for the dismissal of each of the jurors in question, so that the question of whether defendant has made a *prima facie* showing of discrimination need not be addressed, and, of the black prospective jurors who were excused, two had relatives who had been involved in violent behavior; one of those failed to put the information on the juror questionnaire and the other would not give her views on the death penalty; another had significant gaps in his employment history like defendant and his response to the juror questionnaire indicated that he had some difficulty understanding instructions; another was excused because she worked as a guard on death row; and another was excused because he was not candid about his work record. The State's excusal of these jurors was based on race-neutral reasons that were clearly supported by the individual jurors' responses during *voir dire*.

**Am Jur 2d, Jury § 235.**

**Proof as to exclusion of or discrimination against eligible class or race in respect to jury in criminal case. 1 ALR2d 1291.**

**Use of peremptory challenge to exclude from jury persons belonging to a class or race. 79 ALR3d 14.**

**4. Evidence and Witnesses § 305 (NCI4th)— first-degree murder—prior assault—admissible**

The trial court did not err in a prosecution for a first-degree murder committed in 1989 by admitting evidence of an assault committed by defendant in 1981, when he was thirteen, where there were unusual facts and strikingly similar acts in both crimes

so as to permit admission of the 1981 assault for purposes of proving identity. Because the prior crime here is offered to show identity rather than common plan or scheme, the passage of time in this case affects the weight of the evidence rather than its admissibility. The probative value of the evidence outweighs any potential for unfair prejudice because the identity of the perpetrator was a critical issue at trial.

**Am Jur 2d, Evidence §§ 452 et seq.**

**Admissibility of evidence of subsequent criminal offenses as affected by proximity as to time and place. 92 ALR3d 545.**

5. **Evidence and Witnesses § 701 (NCI4th)— first-degree murder—prior assault—limiting instruction**

There was no error in a first-degree murder and attempted rape prosecution where the court admitted evidence of a prior assault and defendant contended that the court improperly instructed the jury as to the purpose of the evidence by failing to specify the charged offense for which the evidence could be considered. The prior crime was relevant on the issue of the identity of the assailant as to both offenses.

**Am Jur 2d, Evidence §§ 1120 et seq., 1283.**

6. **Evidence and Witnesses § 981 (NCI4th)— first-degree murder—prior trial—witness unavailable—mental illness**

There was no error in a first-degree murder prosecution where the court determined that a witness from defendant's first trial was unavailable where the witness had been hospitalized in a psychiatric wing after she testified at the prior trial; she got out of her mother's car at an intersection on the way to testify at this trial and was found by the police hiding at a friend's house; a doctor testified that she would become more depressed if she testified and that her depression could lead to suicide; the witness was located and brought into court; and she told the judge that she did not want to testify and would refuse to do so if ordered. N.C.G.S. § 8C-1, Rule 804(a)(4).

**Am Jur 2d, Evidence §§ 692 et seq.**

**Admissibility of former testimony of nonparty witness, present in jurisdiction, who refuses to testify at subsequent trial without making claim of privilege. 92 ALR3d 1138.**

STATE v. CARTER

[338 N.C. 569 (1994)]

**7. Evidence and Witnesses §§ 315, 345 (NCI4th)— attempted rape and first-degree murder—other offense—admissible on identity and intent**

The trial court did not err in a prosecution for attempted rape and first-degree murder by admitting evidence of another rape to which defendant pled guilty, where the similarity between the two crimes, closely connected temporally, clearly supports the admission of the other rape to prove identity and intent. N.C.G.S. § 8C-1, Rule 404(b).

**Am Jur 2d, Evidence §§ 437 et seq., 452 et seq.; Rape § 71.**

**Admissibility, in rape case, of evidence that accused raped or attempted to rape person other than prosecutrix. 2 ALR4th 330.**

**8. Evidence and Witnesses § 370 (NCI4th)— attempted rape and first-degree murder—other rape—common plan or scheme·**

The trial court did not err in an attempted rape and first-degree murder prosecution by admitting evidence of another rape ·to show identity on the theory of common scheme or plan.

**Am Jur 2d, Evidence §§ 450 et seq.; Rape § 71.**

**Admissibility, in rape case, of evidence that accused raped or attempted to rape person other than prosecutrix. 2 ALR4th 330.**

**Admissibility, under Rule 404(b) of the Federal Rules of Evidence, of evidence of other crimes, wrongs, or acts similar to offense charged to show preparation or plan. 47 ALR Fed 781.**

**9. Evidence and Witnesses § 701 (NCI4th)— first-degree murder and attempted rape—evidence of another rape—instruction**

There was no error in a prosecution for attempted rape and first-degree murder in the trial court's limiting instruction on evidence of another rape. The evidence was relevant and the instructions properly expounded the theories underlying the admissibility of the evidence.

**Am Jur 2d, Evidence § 1283.**

**10. Evidence and Witnesses § 1694 (NCI4th)— first-degree murder and attempted rape—photographs of victim and crime scene**

There was no plain error in an attempted rape and first-degree murder prosecution in the admission of photographs of the victim and the scene where the photographs were used to illustrate the pathologist's testimony concerning wounds on the body, the cause of death, and the crime scene.

**Am Jur 2d, Evidence §§ 960 et seq., 974.**

**Admissibility of photograph of corpse in prosecution for homicide or civil action for causing death. 73 ALR2d 769.**

**11. Criminal Law § 1316 (NCI4th)— first-degree murder—sentencing—evidence of prior incidents—admissible**

The trial court did not err in a first-degree murder sentencing hearing by admitting testimony from defendant's probation officer that defendant was a fair probationer but consistently denied having a drug or alcohol problem despite the offer of assistance in making drug treatment available, and testimony that in the past defendant had punched his girlfriend and hit her with brass knuckles, cursed and spit on his girlfriend and the mother of his children and fought with officers who came to arrest him, and refused to enter a room and haggled with a courtroom deputy while in custody. This evidence was admissible to counter defendant's evidence of his good character traits, to rebut the mitigating circumstances submitted regarding defendant's age, his being a loving father and his good adaption to prison life, and to rebut the mitigating circumstance relating to defendant's "misuse or abuse" of drugs.

**Am Jur 2d, Criminal Law §§ 598, 599; Evidence §§ 428, 431.**

**Court's right, in imposing sentence, to hear evidence of, or to consider, other offenses committed by defendant. 96 ALR2d 768.**

**12. Evidence and Witnesses § 2916 (NCI4th)— first-degree murder—sentencing hearing—scope of cross-examination**

There was no error in a first-degree murder and attempted rape sentencing hearing where defendant contended that the

court erred by permitting the State to cross-examine his psychologist beyond the scope of direct examination where the State's questions regarding defendant's ability to maintain an erection, his earlier expulsion from school, his disciplinary problems as a teenager, a 1981 robbery conviction, and his teenage rejection of attempts to alter his behavior were for the purpose of challenging the psychologist's opinion that, even though defendant had been diagnosed as a teenager as being a Willie-M child prone to uncontrollable violence, his problem on the night of the murder was likely drug and alcohol abuse which resulted in behavioral and mental problems and that defendant was so encumbered by drugs and alcohol on that night that he was incapable of sexual intercourse.

**Am Jur 2d, Witnesses §§ 471 et seq., 520.**

13. **Criminal Law § 1345 (NCI4th)— first-degree murder—sentencing—aggravating circumstance—especially heinous, atrocious, or cruel**

The trial court in a first-degree murder sentencing hearing did not err by submitting the especially heinous, atrocious or cruel aggravating circumstance to the jury where the State's evidence showed that defendant ripped off Amelia Lewis's pants on a cold night in December in a back alley and covered her body with abrasions and lacerations as she struggled against him; Amelia called out numerous times to defendant, "please don't kill me, I will do anything if you don't kill me"; defendant silenced her by squeezing his hands around her neck; Amelia fought for some time, desperately trying to remove his hands, digging her nails into her own skin, to no avail; she struggled for at least two minutes, with defendant's hands pressed firmly around her neck, before losing consciousness; death from manual strangulation would have taken at least four minutes; and defendant was not satisfied with the expedience of her death, so he pounded her in the head several times with a brick. This evidence, when viewed in the light most favorable to the State, was sufficient to support an inference that the murder was physically agonizing or otherwise dehumanizing to the victim; furthermore, the facts of this case support an inference that the murder involved the infliction of psychological torture.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that mur-**

STATE v. CARTER

[338 N.C. 569 (1994)]

der was heinous, cruel, depraved, or the like—post-*Gregg* cases. **63 ALR4th 478.**

14. **Criminal Law §§ 1339, 1347 (NCI4th)— first-degree mur-der—sentencing—aggravating circumstances—course of conduct—murder committed during attempted rape**

The trial court did not err during a sentencing hearing for first-degree murder and attempted rape by submitting to the jury the aggravating circumstances that defendant engaged in a course of conduct including other violent crimes and that the murder was committed during the course of an attempted rape where there was evidence that defendant had committed another rape later in the evening and that he had attempted to rape the murder victim. Although defendant contends that it was not made clear to the jury whether the course of conduct aggravating circumstance was based on the other rape or on the attempted rape of the murder victim, the instruction on course of conduct made clear that the jury was to consider a crime of violence by defendant against another person, referring to a person other than the rape victim, and the circumstance that the murder was committed during another felony referred to an attempt to commit rape. The jury must have understood which respective felonies formed the basis of each of the aggravating circumstances submitted.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed continuing threat to society, and the like—post *Gregg* cases. 65 ALR4th 838.**

**Sufficiency of evidence, for death penalty purposes, to establish statutory aggravating circumstance that murder was committed in course of committing, attempting, or fleeing from other offense, and the like—post-*Gregg* cases. 67 ALR4th 887.**

15. **Criminal Law § 1339 (NCI4th)— first-degree murder—sentencing—aggravating circumstance—murder committed during attempted rape—evidence sufficient**

The trial court did not err in a first-degree murder sentencing hearing by submitting the aggravating circumstance that the mur-

der was committed during an attempted rape where defendant contended that there was no evidence of an initiation of sexual intercourse, forcible or otherwise, between defendant and the victim, but the victim's left pant leg was completely off when her body was discovered, her panties were down and her brassiere was above her breasts; she had multiple abrasions and lacerations; the defendant's clothes had blood on them of the same type as that of the victim; and there was evidence that shortly after defendant murdered Amelia Lewis he raped Kesha Davis.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for death penalty purposes, to establish statutory aggravating circumstance that murder was committed in course of committing, attempting, or fleeing from other offense, and the like—post-*Gregg* cases. 67 ALR4th 887.**

16. **Constitutional Law § 371 (NCI4th)— first-degree murder—death penalty—constitutional**

The North Carolina death penalty is neither vague nor overbroad and is not applied in a discriminatory and discretionary manner.

**Am Jur 2d, Criminal Law § 628.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

17. **Criminal Law § 1323 (NCI4th)— first-degree murder—sentencing—instructions—mitigating circumstances—"may" rather than "must"**

The trial court did not err during a first-degree murder sentencing hearing by instructing the jury that it "may" rather than "must" consider any mitigating circumstances found by the jury.

**Am Jur 2d, Trial §§ 1441 et seq.**

18. **Criminal Law § 1373 (NCI4th)— first-degree murder—death penalty—not disproportionate**

A death sentence for first-degree murder was not disproportionate where the record supports the jury's finding of the aggravating circumstances that the murder was committed while defendant was attempting to commit rape, that the murder was

**STATE v. CARTER**

[338 N.C. 569 (1994)]

especially heinous, atrocious or cruel, and that defendant was engaged in a course of conduct involving other violent crimes, there is no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, there is no significant similarity between this case and each of the cases relied upon by the defendant in which the jury recommended life imprisonment, and the present case is more similar to certain cases in which the jury found either the especially heinous, atrocious or cruel aggravating circumstance or the course of conduct aggravating circumstance.

**Am Jur 2d, Criminal Law § 628.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

Judge MITCHELL concurring in the result.

Justices MEYER and PARKER join in this concurring opinion.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Griffin, J., at the 10 April 1992 Criminal Session of Superior Court, Wayne County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to an additional judgment imposed for attempted second-degree rape was allowed by this Court on 14 July 1993. Heard in the Supreme Court 31 January 1994.

*Michael F. Easley, Attorney General, by Debra C. Graves, Assistant Attorney General, for the State.*

*Urs R. Gsteiger and Elizabeth Horton for defendant-appellant.*

EXUM, Chief Justice.

At the 28 October 1991 Criminal Session of Superior Court, Wayne County, the Honorable James R. Strickland presiding, defendant was tried for first-degree kidnapping, first-degree murder and attempted second-degree rape of Amelia Lewis. At the conclusion of the State's evidence, the trial judge directed a verdict for defendant on the first-degree kidnapping charge. The jury was unable to reach a verdict on the other charges, and a mistrial was declared as to the first-degree murder and attempted second-degree rape charges.

STATE v. CARTER

[338 N.C. 569 (1994)]

The case again came on for trial at the 30 March 1992 Criminal Session of Superior Court, Wayne County, the Honorable William C. Griffin presiding. At the second trial defendant was found guilty of first-degree murder and attempted second-degree rape. After a separate sentencing proceeding, the jury recommended that defendant be sentenced to death upon his conviction of first-degree murder. On 10 April 1992, judgment was entered by Judge Griffin sentencing defendant to death in the first-degree murder case. In the attempted second-degree rape case, defendant was sentenced to a term of imprisonment of ten years. As to the first-degree murder conviction, defendant brings forward numerous assignments of error relative to both the guilt-innocence phase and the sentencing phase of his trial. Having thoroughly reviewed the transcript, the record on appeal, the briefs and oral arguments, we conclude that defendant received a fair trial free from prejudicial error and that the sentence of death is not disproportionate.

I.

During the guilt-innocence phase, defendant discharged his court-appointed counsel, Mr. Jordan and Mr. Braswell, electing instead to represent himself. Judge Griffin appointed Mr. Jordan and Mr. Braswell as standby counsel.

The State offered evidence which tended to show the following narrated facts. In December 1989, Amelia Lewis was twenty years old, stood five feet tall and weighed ninety pounds. She was last seen alive by her cousin, Latrecia Lewis, on Friday, 15 December, at around 10:00 p.m. Amelia left the home she and Latrecia shared with their grandmother in Goldsboro at that time on foot. Amelia made a collect call to a friend, Cecil Speed-Reid, from a phone booth near Amelia's home on 15 December at about 11:00 p.m. Speed-Reid agreed to drive Amelia to the bus station at midnight to pick up her baggage. Amelia planned to meet Speed-Reid at Speed-Reid's house, but she never made it there.

The Goldsboro Police Department received a call at 11:22 p.m. on 15 December 1989 which reported a woman screaming, "please don't kill me," from the alley on Walnut Street. An officer responded and "cleared the area" at 11:27 p.m. He saw nothing. On Monday, 18 December, at 7:00 a.m., the body of the victim, Amelia Renae Lewis, was found in the alley behind the Old Waynesborough Hotel, the area from which the report had come earlier.

**STATE v. CARTER**

[338 N.C. 569 (1994)]

When Amelia's body was discovered by Capt. C.E. Boltinhouse of the Goldsboro Police Department at the scene of the crime at about 8:00 a.m., her left pant leg was off completely. This reminded Capt. Boltinhouse of the description of a rape reported by Kesha Davis on 15 December 1989 which occurred just four blocks away. Defendant was identified by Davis as the rapist. In addition to the left pant leg being off, Amelia's brassiere was above her breasts; her panties were down; and her sweater, saturated with blood, was wrapped around her head, covering her face and head.

On 18 December, Capt. Boltinhouse went to defendant's house to arrest him for the Davis rape. Defendant was not there, and his mother consented to a search of her home. The search resulted in the seizure of defendant's green sweatshirt, a pair of jeans and a pair of black Carolina Turkey boots which matched the description Davis gave of her rapist's clothing. On 18 December, defendant was arrested for the rape of Kesha Davis. As defendant was being processed, investigators observed scratches on his face and a discoloration of his left eye.

An autopsy of the victim's body in this case revealed hemorrhages to her left eye, larger hemorrhages to her right eye, blunt trauma to the head, multiple skull fractures and lacerations of the scalp. There were abrasions above her right breast and between her breasts, inside her right upper arm, on both knees, the front of her left shin, her face, left forehead, chin, left to mid lower lip, and the front and sides of her neck. The neck abrasions indicated nails digging into the skin. The abrasions to the knees indicated a fall. Certain abrasions on her back appeared to have occurred after death. She had a laceration over the left side of her forehead and a large laceration of her right forehead above her eye which contained a reddish-brown material and bone. from fractures. Her neck muscles were bruised, and there was a large tear of her liver with no bleeding, indicating this injury also occurred after death. Amelia's death was caused by manual strangulation and blunt trauma to the head, either of which was sufficient to cause death. The blunt trauma to the head caused brain injury and could have been inflicted by a brick. The injury to her liver would have been fatal had she not been dead already. This injury was probably caused by a punch or stomp while the body was lying face up. There were no defense wounds and no trauma to the vagina or genitalia.

Forensic evidence tended to show the following. The only unknown hairs from Amelia's body were Caucasian. Defendant is

Oriental and African-American by race. Fingernail scrapings from the victim were compared with samples from the defendant's sweatshirt. Some of the particles, specifically nail polish, originated from the same source. DNA comparisons provided no positive identification. Defendant's green sweatshirt and blue jeans contained human blood splatter. These blood splatters matched the victim's blood and were inconsistent with defendant's blood.

Inside a dumpster near where the victim's body was found, investigators discovered a brick underneath a couple of garbage bags. The brick had hair and blood on it, and a corner of it was chipped away. The blood on the brick matched the victim's blood and was inconsistent with defendant's blood. Fibers from the wheel of the dumpster were consistent with known samples of fibers from defendant's green sweatshirt. Fingernail clippings from the victim's hand contained fibers consistent with known samples from defendant's green sweatshirt. Fragments of brick from the victim's head fitted together perfectly to fill the chipped area on the brick.

The only evidence that defendant introduced during the guilt-innocence phase of his trial was the testimony of one witness, Audrey Lynch, an FBI expert in DNA analysis. Lynch testified that the materials she received were insufficient to develop or obtain any DNA profiles.

Additional evidence introduced during the trial will be discussed where pertinent to the issues raised by the defendant.

### Guilt Phase Issues

### II.

[1] We discuss first defendant's assignment of error that the trial court erred in allowing his motion to proceed *pro se*. At the start of defendant's trial, he told the court that he was dissatisfied with his court-appointed counsel and requested that the court appoint new counsel for him. The court, finding counsel to be competent, informed defendant that he was not entitled to court-appointed counsel of his choice and denied defendant's request. Defendant then requested the right to proceed *pro se*, at which point the following discussion took place:

THE COURT: Well, you can you have a right to proceed and represent yourself if you want to do that. I would not advise you to do that but I mean if you want to discharge them completely and

proceed without a lawyer, I mean you are at liberty to do that. However, I would—

MR. CARTER: Send them home then. If I got to do any time, if I got to get any kind of death penalty, I got to do it so send them home. I don't want them.

THE COURT: Mr. Carter, I don't believe you want to do that.

MR. CARTER: I do. Believe me, I do.

THE COURT: Well, I can appoint them as standby counsel and I am going to do that if I allow you to discharge them.

The court next ordered a recess, specifically to afford defendant additional time to reconsider his decision and then asked him the following questions:

THE COURT: All right. Well, I am going to, I am going to if you want—you are going to discharge them then? That's what you are going to do?

MR. CARTER: Yes, sir.

THE COURT: And you are going to proceed without a lawyer?

MR. CARTER: Yes, I am.

The court then discharged defendant's counsel and permitted defendant to proceed *pro se.*

Before a defendant is allowed to waive in-court representation by counsel, the trial court must insure that constitutional and statutory standards are satisfied. *State v. Thomas*, 331 N.C. 671, 673, 417 S.E.2d 473, 475 (1992). First, the defendant must "clearly and unequivocally" waive his right to counsel and instead elect to proceed *pro se. Id.* Second, the trial court must determine whether the defendant knowingly, intelligently, and voluntarily waived his right to in-court representation by counsel. *Id.* at 674, 417 S.E.2d at 476. In determining whether the waiver meets this standard, the trial court must conduct a thorough inquiry. *Id.* This Court has held that the inquiry required by N.C.G.S. § 15A-1242 satisfies constitutional requirements. *Id.* The statute provides:

A defendant may be permitted at his election to proceed in the trial of his case without the assistance of counsel *only after the trial judge makes thorough inquiry and is satisfied* that the defendant:

(1) Has been clearly advised of his right to the assistance of counsel, including his right to the assignment of counsel when he is so entitled;

(2) Understands and appreciates the consequences of this decision; and

(3) Comprehends the nature of the charges and proceedings and the range of permissible punishments.

N.C.G.S. § 15A-1242 (1993) (emphasis added).

Defendant, relying on *State v. Pruitt*, 322 N.C. 600, 369 S.E.2d 590 (1988), contends that the trial judge failed to make the necessary inquiry under N.C.G.S. § 15A-1242 to permit defendant to represent himself. In *Pruitt*, this Court stated:

The inquiry to be made by the trial court under N.C.G.S. § 15A-1242 is mandatory and failure to conduct such an inquiry is prejudicial error. Furthermore, "neither the statutory responsibilities of standby counsel, N.C.G.S. § 15A-1243, nor the actual participation of standby counsel . . . is a satisfactory substitute for the right to counsel in the absence of a *knowing and voluntary waiver*." *State v. Dunlap*, 318 N.C. 384, 389, 348 S.E.2d 801, 805 (1986).

*Pruitt*, 322 N.C. at 603, 369 S.E.2d at 592 (citation omitted) (emphasis added).

We hold that the trial court, in granting defendant's motion to proceed *pro se*, did follow the mandatory inquiry required by N.C.G.S. § 15A-1242. *Pruitt* is not applicable here because in *Pruitt* no colloquy occurred between the trial judge and the defendant. Instead, the trial judge directed his inquiry to defendant's counsel. In this case, defendant asked the court how he could discharge Mr. Braswell and Mr. Jordan, indicating he did not wish to stand trial with them as his counsel. Judge Griffin informed defendant of his right to represent himself, although advising against it. Defendant told the court in clear and unequivocal terms that he would prefer to represent himself. Judge Griffin said that he would appoint Mr. Braswell and Mr. Jordan as standby counsel. Judge Griffin then ordered a recess so that defendant could reconsider his decision to discharge counsel and represent himself. After the recess, defendant reaffirmed his desire to represent himself, and Judge Griffin agreed to defendant's request.

During the discussion between Judge Griffin and defendant, defendant clearly indicated that he realized he was facing a possible death sentence, stating, "[I]f I got to get any kind of death penalty I got to do it so send them home." Defendant also indicated that he realized he was being retried on the same matters on which he had previously been tried during a three and one-half week long trial which ended in a mistrial.

*Pruitt* does not set forth any specific guidelines relating to how the statutorily mandated inquiry must proceed. Rather, the critical issue is whether the statutorily required information has been communicated in such a manner that defendant's decision to represent himself is knowing and voluntary. We find that Judge Griffin's inquiry elicited the required information and was therefore sufficient for him to determine that defendant's decision was both knowing and voluntary. Accordingly, defendant is not entitled to a new trial on this ground.

### III.

Defendant's next assignments of error pertain to the jury selection process. Defendant argues that the trial court erred by improperly excusing for cause prospective jurors Bullock, Royal and Stover. Defendant also argues that the trial court erred in permitting the prosecutor to exercise peremptory challenges to exclude black jurors on the basis of race in violation of *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986).

### A.

[2] Unless the trial court's ruling or a challenge for cause is required by law, *see, e.g.*, *State v. Hightower*, 331 N.C. 636, 417 S.E.2d 237 (1992), and *State v. Cunningham*, 333 N.C. 744, 429 S.E.2d 718 (1993), the ruling is reviewable on an abuse of discretion standard, *State v. Kennedy*, 320 N.C. 20, 28, 357 S.E.2d 359, 364 (1987). N.C.G.S. § 15A-1212(9) permits a challenge for cause against any prospective juror who "is unable to render a fair and impartial verdict." N.C.G.S. § 15A-1212(9) (1993).

In the present case, the trial judge asked preliminary questions of all the prospective jurors concerning their acquaintance with the defendant or his family. During the *voir dire* of Royal, the following transpired:

THE COURT: . . . Any of you happen to be acquainted with he [sic] or his family? Yes, ma'am, Mrs., Mrs. Royal?

A:   I, I worked with some, with one of his families [sic] at Busman's and she says she is kin to him.

THE COURT: All right. Do you know what the nature of that relationship is?

A:   All she said was cousin.

. . . .

THE COURT: Do you feel like that your acquaintance with her or the fact that you will be working there would put you in a position that would make it so you feel like you shouldn't be a juror in this case?

A:   Yes, sir. I do.

THE COURT: You feel like that it might bear upon your ability to be fair and impartial in the case?

A:   Yes, sir.

THE COURT: All right. You rather not be on it I take it the way you are answering?

A:   That's right.

THE COURT: Okay. And you say you work with this lady every day?

A:   Yes, sir. Every day.

. . . .

THE COURT: Okay. All right. I believe I am going to let you step down, Mrs. Royal.

A:   Okay. Thank you.

During the *voir dire* of Stover, the following transpired:

THE COURT: . . . Do either of you know the defendant in this case, Mr. Carter, or any of his family.

JUROR: 12: (Nodded affirmatively).

THE COURT: Ms. Stover, can you tell us a little bit about that if you would please.

A:   I mean I don't know him—I know him but not enough to—

THE COURT: Okay. You, you know him as a member of the community; is that what you are saying?

A: Yes.

THE COURT: Do you know him as, any of his family personally?

A: No.

THE COURT: All right. Is your acquaintance with him such that it would make it impossible for you to sit in this case as an impartial juror you think?

A: Yes, it would.

THE COURT: You feel like that that acquaintance is such it would make it so you would not be able to be impartial; is that right?

A: Yes.

THE COURT: All right. I will let you step down. Thank you.

The trial court excused jurors Royal and Stover after making its own inquiry of them and deciding that they could not be fair and impartial because of their prior acquaintance with defendant or a relative of defendant. The colloquy between the trial court and these jurors supported this decision; therefore, there was no abuse of discretion in excusing either of them.

Finally, the trial court excused for cause juror Bullock because she was in her eighth month of pregnancy and had indicated that if the trial lasted more than two weeks, she could go into labor. This was Bullock's first pregnancy. We conclude that the trial court did not abuse its discretion by allowing a challenge for cause against Bullock. Accordingly, defendant's assignments of error on this issue are overruled.

## B.

[3] Second, defendant contends that the State exercised its peremptory challenges to exclude black jurors on the basis of race in violation of *Batson v. Kentucky*. The United States Supreme Court, in *Batson v. Kentucky*, 476 U.S. at 89, 90 L. Ed. 2d at 83, held that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution forbids the use of peremptory challenges in a racially discriminatory manner. Likewise, this Court has held that the North Carolina Constitution forbids such race-based use of peremptory challenges. *State v. Smith*, 328 N.C. 99, 119, 400 S.E.2d 712, 723 (1991).

In *Batson*, the Supreme Court set forth a three-part test to determine if a prosecutor has impermissibly excluded jurors because of their race. First, the defendant must establish a *prima facie* case that the prosecutor peremptorily challenged prospective jurors on the basis of race. *State v. Robinson*, 330 N.C. 1, 15, 409 S.E.2d 288, 296 (1991). In this case, the prosecutor voluntarily gave reasons for the dismissal of each of the jurors in question. Accordingly, we need not address the question of whether defendant has made a *prima facie* showing of discrimination and may proceed as if defendant has met this burden. *Id.* at 17, 409 S.E.2d at 296.

Once the defendant succeeds in making a *prima facie* showing, the burden shifts to the prosecutor to offer a racially neutral explanation for each challenged strike. The prosecutor's explanation need not, however, rise to the level justifying a challenge for cause. *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88. Finally, the trial court must determine whether the defendant has proven purposeful discrimination. *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405 (1991). Because the trial court's findings will be based on the prosecutor's credibility, an appellate court should not overturn these findings in the absence of a clear abuse of discretion. *Id.* at 364-65, 114 L. Ed. 2d at 408-09.

Defendant in this case is fifty percent Asian and fifty percent African-American. His jury consisted of twelve white individuals. Of the prosecutor's first three peremptory challenges, two were used to excuse whites and one to excuse a black person (Ms. Wilkins). The next three peremptory challenges were all against blacks (Ms. Hines, Mr. McDowell and Ms. Thomas). Following the peremptory challenge of these three jurors, the defendant objected. Later, the prosecutor exercised a peremptory challenge against one more black person (Mr. Garner), and defendant again objected. Meanwhile, the prosecutor had exercised peremptory challenges against seven white jurors. The prosecutor then accepted a black person as a second alternate although he had two unused peremptory challenges.

Although the trial court did not find that defendant had made a *prima facie* showing of racial discrimination, the prosecutor nevertheless offered his explanations for the exercise of peremptory challenges against the five blacks. The explanations were as follows: Ms. Wilkins was excused because she had a nephew who had been involved in two shootings, and she had failed to put this information on the juror questionnaire. Ms. Hines was excused because she had a

**STATE v. CARTER**

[338 N.C. 569 (1994)]

relative who was recently convicted of armed robbery and would not give her views on the death penalty. Defendant in this case had a history of violent behavior dating back to his teenage years, and the prosecutor did not want jurors who were sympathetic to persons with this kind of history.

Mr. McDowell was excused because he had significant gaps in his employment history like defendant, and his responses to the juror questionnaire indicated he had some difficulty understanding instructions. On the questionnaire, Mr. McDowell was unclear about whether he had previously been tried for embezzlement, whether he had served on a jury where someone else was tried for embezzlement, or whether he had served as a juror in a civil case that somehow related to embezzlement. Because most of the evidence in this case was circumstantial, the prosecutor stated that he preferred jurors who did not have difficulty with instructions.

Ms. Thomas was excused because she worked for the Department of Correction as a guard on death row. In defendant's prior trial, a Department of Correction's employee had been responsible for hanging up the jury. Finally, Mr. Garner was excused because he was not candid about his work record, and his responses in court differed from his responses on the questionnaire. Therefore, the prosecutor was suspicious of his honesty in general and his motives for wanting to sit on the jury.

We hold that the trial court properly overruled defendant's objection to the State's use of its peremptory challenges to excuse each of these jurors. The State's excusal of these jurors was based on race-neutral reasons that were clearly supported by the individual jurors' responses during *voir dire*. The trial court correctly ruled that the State did not exclude any jurors based solely on their race in violation of *Batson*. Defendant's assignments of error on these grounds are overruled.

IV.

[4] In his next assignment of error, defendant contends the trial court erroneously admitted evidence of an assault committed by defendant in 1981.

A.

The evidence was that on 15 October 1981, defendant assaulted an elderly man named John Hughes in a housing project with a piece

of a cinder block. The cinder block was roughly the same size and dimensions of a brick which the State's evidence tended to show was the murder weapon in this case. Defendant was thirteen years old at the time of this assault. The State offered this evidence as tending to prove that defendant was Amelia Lewis's assailant.

Rule 404(b) provides that evidence of other crimes, wrongs, or acts may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." N.C.G.S. § 8C-1, Rule 404(b) (1993). Such evidence is relevant and admissible under Rule 404(b) against a defendant "if the incidents are sufficiently similar and not too remote in time so as to be more probative than prejudicial under the Rule 403 balancing test." *State v. Scott*, 318 N.C. 237, 248, 347 S.E.2d 414, 420 (1986).

The other crime may be offered on the issue of defendant's identity as the perpetrator when the *modus operandi* of that crime and the crime for which defendant is being tried are similar enough to make it likely that the same person committed both crimes. *State v. Moore*, 309 N.C. 102, 305 S.E.2d 542 (1983). This theory of admissibility requires "some unusual facts present in both crimes or particularly similar acts which would indicate that the same person committed both crimes." *Id.* at 106, 305 S.E.2d at 545.

Here, we find there are unusual facts and strikingly similar acts in both crimes so as to permit admission of the 1981 assault for purposes of proving identity. The State's evidence tended to show that one cause of Amelia Lewis's death was blunt trauma to the head, which was caused by a brick. The primary wound was above the right eye, and defendant is right-handed. In the 1981 assault, the wound to the victim was also above the victim's right eye, and the weapon was a square portion of a cinder block which the State argues was very similar in size to the brick in this case.

Defendant argues that because the prior assault occurred eight years ago, it is too remote in time and should be excluded on that basis. In *State v. Stager*, 329 N.C. 278, 406 S.E.2d 876 (1991), this Court held that a prior act which occurred ten years before the crime charged was not too remote. The Court reasoned:

Remoteness in time . . . is more significant when the evidence of the prior crime is introduced to show that both crimes arose out of a common scheme or plan. In contrast, remoteness in time is

.less significant when the prior conduct is used to show intent, motive, knowledge, or lack of accident; remoteness in time generally affects only the weight to be given such evidence, not its admissibility.

*Id.* at 307, 406 S.E.2d at 881 (citations omitted).

This Court also admitted evidence of a six-year-old offense under Rule 404(b) in *State v. Riddick*, 316 N.C. 127, 340 S.E.2d 422 (1986). In *Riddick*, the Court stated:

Remoteness in time is less important when the other crime is admitted because its *modus operandi* is so strikingly similar to the *modus operandi* of the crime being tried as to permit a reasonable inference that the same person committed both crimes. It is reasonable to think that a criminal who has adopted a particular *modus operandi* will continue to use it notwithstanding a long lapse of time between crimes.

*Id.* at 134, 340 S.E.2d at 427.

The prior crime here, like in *Stager* and *Riddick*, is not being offered to show common plan or scheme, but to show identity. Therefore, the passage of time in this case affects the weight of the evidence rather than its admissibility.

Next, defendant argues that even if evidence of the 1981 assault had some relevancy, it fails the balancing test of Rule 403 since its probative value is far outweighed by its prejudicial effect. We are well aware of the propensity for unfair prejudice to a defendant when evidence is introduced that he has committed a crime separate and distinct from the crime or crimes for which he is being tried. However, the facts of each case will ultimately determine whether evidence of a defendant's former crime is pertinent in his prosecution for another independent crime. *State v. Shane*, 304 N.C. 643, 654, 285 S.E.2d 813, 820 (1982), *cert. denied*, 465 U.S. 1104, 80 L. Ed. 2d 134 (1984).

In this case, we are satisfied that the probative value of the 1981 assault evidence outweighs any potential for unfair prejudice against defendant. The similarities between the 1981 crime and the crime charged here are highly probative on the issue of identity. Defendant was clearly identified as the assailant in the 1981 case. However, the identity of the perpetrator in this case was a critical issue at trial since the evidence connecting defendant to the crime was totally circumstantial.

STATE v. CARTER

[338 N.C. 569 (1994)]

B.

**[5]** Defendant next argues the trial court improperly instructed the jury as to the purpose of the evidence. The trial judge instructed the jury as follows:

> The State seeks to offer this evidence for a limited purpose and that is in an effort to provide the evidence which it contends would establish the identity of the defendant in the case we are presently engaged [in] trying. Again, as I told you earlier, this evidence, if it does show that, then that's for you to say and determine, the weight and credibility of this evidence on that question is for the jury always to determine.

Later, the trial judge again instructed the jury by stating: "I earlier told you, of course, that the weight and credibility of the evidence with regard to the defendant's prior conduct in 1981 is received for the sole purpose to, if the jury finds that it does, show his identity by *modus operandi*." (Emphasis added.)

Defendant contends these instructions erroneously failed to specify for which charged offense, murder or attempted rape, the evidence could be considered. We agree with the State that there was no need for the trial court to specify the offense to which the 1981 assault evidence related inasmuch as it was relevant on both offenses. Defendant's reliance on *State v. White*, 331 N.C. 604, 419 S.E.2d 557 (1992), is misplaced. In *White*, evidence of a prior rape was offered to show defendant's intent to rape the murder victim. Yet, the trial court later dismissed the rape charge. This Court determined that the trial court erred in failing to instruct the jury to ignore the evidence of the prior rape because of the dismissal of the only charge to which it was relevant. Unlike *White*, the prior crime evidence was relevant on the issue of the identity of Amelia Lewis's assailant as to both offenses, the murder and the attempted rape.

V.

In his next assignment of error, defendant contends the trial court committed error in offering the prior testimony of Kesha Davis taken at defendant's first trial, recounting how the defendant raped her shortly after midnight on 16 December 1989. Defendant argues that the trial court erred in concluding that Kesha Davis was unavailable as a witness, that the evidence was inadmissible under Rule 404(b) and that the trial court's limiting instruction on this evidence was improper.

A.

**[6]** We will first address defendant's contention that Kesha Davis was not unavailable as a witness. Evidence Rule 804(a)(4) states that a witness is unavailable if she is unable to testify due to "an existing physical or mental illness or infirmity." N.C.G.S. § 8C-1, Rule 804(a)(4) (1993).

Kesha Davis, who was nineteen years old at the time of this trial, was under subpoena from the State to testify. Davis's mother testified that as she drove Davis to court, she stopped at an intersection, and Davis got out of the car and began walking away. She did not know where Davis went, and Davis did not return home that evening. The police located her hiding out at a friend's home. According to her mother, Davis was hospitalized in the psychiatric wing at Wayne Memorial Hospital approximately one month after she testified in the previous trial of this case. While Davis was hospitalized at Wayne Memorial, she was treated by Dr. Buttar.

Dr. Buttar met with Davis at the courthouse. He testified that Davis was admitted for depression and alcohol abuse. She was hospitalized for three days and left against his recommendation. In his opinion, Davis would become more depressed if she testified, and her depression could lead to suicide. He believed she needed therapy before testifying.

Davis was located and brought into court. She told the court that she did not want to testify, and if ordered to do so, she would refuse. The trial court found that Kesha Davis was unable to testify due to an existing mental illness and ruled that she was unavailable within the meaning of Rule 804(a)(4).

In *State v. Chandler*, 324 N.C. 172, 376 S.E.2d 728 (1989), a four-year-old victim was so overcome with fear that she could not communicate. After failing to respond to numerous questions by the prosecutor, the trial judge found that the child was unable to testify, declared her unavailable as a witness and admitted her testimony from a former trial. This Court found no error in this ruling, despite the absence of medical testimony to establish the victim's mental disability, saying the trial judge had the opportunity to observe the demeanor of the witness and her inability to respond to questions.

In this case, the trial judge not only observed the demeanor of the witness, but heard the testimony of the witness's former psychiatrist that the witness suffered from a mental infirmity such that testifying

could make her suicidal. The record, therefore, supports the trial court's determination that Kesha Davis was unavailable as a witness, and we find no error in this ruling.

B.

[7] Next, we consider defendant's contention that upon finding Davis unavailable, the trial court improperly admitted her prior testimony on the issues of identity and intent under Evidence Rule 404(b).

Under Rule 404(b), evidence of other crimes, wrongs or acts may be admissible to show motive, opportunity, intent, plan or identity. N.C.G.S. § 8C-1, Rule 404(b) (1993). Defendant was charged with attempted rape in this case. Kesha Davis identified defendant as her assailant, and defendant pled guilty to raping her. The similarity between the Davis rape and the attempted rape of Amelia Lewis is remarkable. The State's evidence at trial tended to show that Amelia Lewis and Kesha Davis were both young women out walking in the same area alone on the night of 15 December 1989. Davis was initially approached by defendant approximately one hour after Amelia's murder and just one block from where Amelia's body was discovered. Moreover, Davis stated that during the rape, defendant completely removed her left pant leg and pulled her panties down. Likewise, Amelia Lewis's left pant leg was off completely, and her panties were down. The similarity between these two crimes, closely connected temporally, clearly supports the admission of the Davis rape to prove identity and intent in the attempted rape of Amelia Lewis for which defendant was being tried.

[8] In addition, we conclude the rape of Kesha Davis was admissible to show defendant's identity as Amelia Lewis's assailant on the theory that both the attempted rape of Lewis and the rape of Davis arose out of a common plan or scheme to rape a woman on the night of 15 December 1989. According to Davis's testimony at trial, after the defendant raped her, he warned her that she should not walk alone at night because someone else might hurt her. Defendant also told Davis he raped her because he was "horny." The evidence supports the admission of the Davis rape on the common plan or scheme theory.

C.

[9] Next, we discuss whether the trial court's limiting instruction to the jury as to the purpose of Kesha Davis's evidence was improper. The trial court instructed that the Davis rape was offered for the purpose of "showing identity, motive, opportunity and so-forth, the things I told you about earlier." Earlier, the court had told the jury:

STATE v. CARTER

[338 N.C. 569 (1994)]

This evidence can be received solely for the purpose of showing the identity of the person who committed the crime charged in this case . . . . That the defendant had a motive . . . . That the defendant had the intent . . . and that there existed in the minds of the defendant a plan, scheme or design involving the crime charged in this case.

We find nothing improper with these instructions inasmuch as they properly expound the theories underlying the admissibility of this evidence.

*State v. White*, 331 N.C. 604, 419 S.E.2d 557 (1992), again relied on by defendant, provides no support for his contentions. In *White*, evidence admitted to prove defendant's identity as the rapist became irrelevant when the rape charge was dismissed. Therefore, the trial court should have instructed the jury to disregard that evidence. Here, the attempted rape charge was submitted to the jury. Accordingly, evidence of the Davis rape was relevant and the instruction was proper.

VI.

[10] Defendant's last assignment of error in the guilt-innocence phase of his trial is that the trial court erred in admitting photographs of the murder victim, Amelia Lewis. The trial court admitted fifteen color photographs of the victim taken in the alley and during autopsy. Of these fifteen photographs, defendant now challenges the admission of eleven as needlessly cumulative and inflammatory. Because defendant failed to object to the photographs at trial, we review for plain error.

Plain error is " 'fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done.' " *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)). The eleven photographs challenged on appeal are five-by-seven inch autopsy photographs and four five-by-seven inch photographs of the victim in the alley, all of which were admitted at trial without objection.

The autopsy photographs were submitted to illustrate the pathologist's testimony concerning Amelia Lewis's multiple wounds. Amelia Lewis's body was found in the back of an alley, partially unclothed, with blood splatters on several surrounding surfaces. The alley photographs were offered to illustrate this scene. One photograph

showed Amelia from the chest up, including the area around her head. There was one close-up of Amelia's face for identification purposes. There were two photographs of the full view of Amelia's body as it was found in the alley, showing how her clothing was partially removed and the area surrounding the body.

Defendant recognizes that the State is allowed to introduce photographs to illustrate the crime. In addition, this Court has determined that "photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as . . . their excessive or repetitious use is not aimed solely at arousing the passions of the jury." *State v. Hennis*, 323 N.C. 279, 284, 372 S.E.2d 523, 526 (1988).

Contrary to defendant's contentions, we conclude the admission of the eleven photographs was neither unduly excessive nor repetitious. They were used to illustrate, respectively, the pathologist's testimony concerning wounds on the body of the victim, the cause of death, and the crime scene. Their admission clearly did not amount to fundamental error or error so basic and so prejudicial that justice could not have been done. *Odom*, 367 N.C. at 660, 300 S.E.2d at 378.

### Sentencing Phase Issues

Having found no errors in the guilt-innocence phase of defendant's trial, we turn now to the sentencing proceeding. Defendant offered the following evidence.

Dr. Robert Borgman, a psychologist and Director of Adult Services at Wayne County Mental Health Center, testified that he examined defendant on 1 November 1991 and diagnosed him as being alcohol and cocaine dependent. Defendant had consumed a great deal of both alcohol and cocaine on 15 December 1989 and as a result had some psychotic symptoms. Defendant had been diagnosed as a Willie-M child between 1981 and 1984 because of his extreme violence against both people and property, but he had never been tested for neurological impairment. In Dr. Borgman's opinion defendant's problem on the day of the murder was likely drug and alcohol abuse which resulted in behavioral and mental problems. Dr. Borgman stated that defendant was so encumbered by drugs and alcohol on the night of 15 December 1989 that he was incapable of sexual intercourse.

Defendant's mother testified that she and her previous husband adopted defendant when he was nine months old when they lived in

Korea, where her husband had been assigned by the Air Force. She separated from her husband and moved to Goldsboro in 1971 when defendant was four. She married her present husband in 1986. Defendant's initial relationship with his new adoptive father was good but began to deteriorate when defendant was about nine or ten years old. Defendant began to have behavior problems and was certified as a Willie-M child after fighting and not communicating.

Since being incarcerated, defendant has received his GED and has enrolled at Shaw University. His mother felt that defendant was now the "normal Marcus," kind, giving, and helping. Defendant idolized his first adoptive father and wanted to be like him. Defendant felt rejected when his first adoptive father remarried and was jealous of his first adoptive father's other children. Defendant was smart, and his failure to get a high school education was not due to a lack of ability. He simply refused schooling until he went to prison. He quit school in the ninth grade. He tried to play basketball but was thrown off the team because he had trouble with the coach two games into the season. Most of his bad behavior involved drugs, but that was not always the case.

In rebuttal, the State offered the following evidence. Defendant was convicted on 17 June 1988 for felonious larceny upon a plea of guilty and on 2 March 1985 for felonious possession of marijuana upon a plea of guilty.

One of defendant's probation and parole officers testified that in 1985 defendant was a "fair" probationer, but despite this officer's offer of assistance in making drug treatment available to defendant, defendant consistently denied having a drug or alcohol problem.

In February or March of 1986, defendant punched his then girlfriend, Sharon Gibbs, in the face. Near the end of 1985, defendant ordered Gibbs to prostitute for him at a truck stop on Highway 117 and threatened to beat her if she did not go along. When they got there, she was afraid to go through with it, and she, defendant, and another man drove to Kinston instead. Later, in May 1986, defendant tried to force Gibbs to perform fellatio; when she refused, he hit her with brass knuckles.

On 25 July 1987, when officers went to arrest defendant at the home of his then girlfriend, Jacqueline Street, the mother of his children, defendant cursed her and spit on her. Defendant fought with and had to be subdued and restrained by the arresting officers.

In November 1991, while defendant was in custody, he refused to enter a room at the request of a courtroom deputy. Finally, after haggling, defendant entered the room.

At the close of the sentencing proceeding, the jury found the following three aggravating circumstances: (i) the murder was committed while the defendant was attempting to commit rape, N.C.G.S. § 15A-2000(e)(5); (ii) the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and (iii) defendant engaged in a course of conduct involving other violent crimes, N.C.G.S. § 15A-2000(e)(11). The jury considered sixteen mitigating circumstances and unanimously rejected fifteen. One or more jurors found a single nonstatutory mitigating circumstance, that the defendant admitted to prior criminal offenses. The mitigating circumstances rejected were:

(1) This murder was committed while defendant was under the influence of mental or emotional disturbance.

. . . .

(2) The capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired.

. . . .

(3) The age of defendant at the time of this murder is a mitigating circumstance.

. . . .

(4A) Marcus L. Carter is an adopted child. He is also a loving father of two children. He has always provided for his children to the best of his ability.

. . . .

(4B) At a very early age, Marcus exhibited signs of mental or emotional disturbance that went untreated.

. . . .

(4C) Marcus Carter's mental and/or emotional disturbances were caused in part by the emotional instability of his family members during his early developmental stages.

. . . .

(4D) Marcus Carter's mental or emotional disturbances were aggravated throughout his childhood and early adulthood by the

actions and interactions of family members towards each other and towards Marcus.

. . . .

(4E) Marcus Carter did not develop a healthy father-son relationship which left him with feelings of isolation and abandonment.

. . . .

(4F) Marcus Carter never felt a part of his family and was deprived of the family nurturing necessary to properly develop.

. . . .

(4G) Marcus Carter's use and misuse or abuse of drugs was a result of his mental or emotional disturbances.

. . . .

(4H) Marcus Carter did not resist arrest.

. . . .

(4I) After his arrest, Marcus Carter voluntarily consented to a blood, pubic hair and saliva test.

. . . .

(4J) Marcus Carter has adapted well to prison life.

. . . .

(4K) Marcus Carter was gainfully employed up to the date of his offense.

. . . .

(4M) Any other circumstances arising from the evidence.

### VII.

[11] Defendant contends the trial court erred in admitting evidence of defendant's assault on Sharon Gibbs in 1986, the July 1987 incident, the November 1991 incident, and the testimony of his probation and parole officer. This evidence was offered in rebuttal by the State.

We think this evidence was admissible in rebuttal to counter defendant's evidence of his good character traits and to rebut the mitigating circumstances submitted regarding defendant's age, his being

a loving father and his good adaption to prison life. The testimony of his probation and parole officer was admissible to rebut the mitigating circumstance relating to defendant's "misuse or abuse" of drugs.

While defendant did not offer "good character" evidence *per se*, his adoptive mother did testify that she felt defendant was the "normal Marcus," kind, giving and helping. In *State v. Silhan*, 302 N.C. 223, 273, 275 S.E.2d 450, 484 (1981), this Court found no error in the admission of rebuttal evidence by the State concerning defendant's bad reputation in the army, which tended to contradict defendant's evidence that he had been a good child, a good husband and father, and a good neighbor. The Court said:

> Our capital sentencing statute not only permits but requires juries to determine the sentence guided "by a carefully defined set of statutory criteria that allow them to take into account the nature of the crime and the character of the accused." *State v. Johnson, supra*, 298 N.C. at 63, 257 S.E.2d at 610. This statute, however, limits the state in its case in chief to proving only those aggravating circumstances listed in section (e). Bad reputation or bad character is not listed as an aggravating circumstance. Therefore the state may not in its case in chief offer evidence of defendant's bad character. A defendant, however, may offer evidence of whatever circumstances may reasonably be deemed to have mitigating value, whether or not they are listed in section (f) of the statute. *State v. Johnson, supra*, 298 N.C. at 72-74, 257 S.E.2d at 616-617. Often this may be evidence of his good character. *Id.* The state should be able to, and we hold it may, offer evidence tending to rebut the truth of any mitigating circumstance upon which defendant relies and which is supported by the evidence, including defendant's good character. Here, despite defendant's contentions to the contrary, he did offer evidence of his good character. It is true that the evidence was not cast in terms of defendant's reputation in his community. Nevertheless it was evidence tending to show defendant to be, generally, a good person by those most intimately acquainted with him. In [the] face of this evidence, the state was entitled to show *in rebuttal* that defendant's reputation among others familiar with it was not good. Both the state and defendant are entitled to a fair sentencing hearing, and the jury is entitled to have as full a picture of a defendant's character as our capital sentencing statute and constitutional limitations will permit.

*Id.* (emphasis added).

In *State v. Oliver*, 309 N.C. 326, 307 S.E.2d 304 (1983), defendant argued on appeal that the trial court erred by allowing a guard at Central Prison to testify for the State concerning Moore's assaultive behavior and uncooperative attitude in prison. The Court concluded that the guard's testimony was relevant to rebut the statutory mitigating circumstance of defendant's age at the time of the crime. We said: "Relevant to this inquiry is not only the chronological age of the defendant, but also his experience, criminal tendencies, and presumably the rehabilitative aspects of his character." *Id.* at 370, 307 S.E.2d at 332. In *State v. Johnson*, 317 N.C. 343, 346 S.E.2d 596 (1986), the Court reasoned: 'Any hard and fast rule as to age would tend to defeat the ends of justice, so the term youth must be considered as relative and this factor weighed in the light of varying conditions and circumstances.' *Id.* at 393, 346 S.E.2d at 624 (quoting *Giles v. State*, 261 Ark. 413, 421, 549 S.W.2d 479, 483, *cert. denied*, 434 U.S. 894, 54 L. Ed. 2d 180 (1977)).

Defendant's evidence tended to show that his bad conduct was due to his abuse of alcohol and drugs, which in turn tended to support the statutory diminished capacity mitigating circumstance and the nonstatutory mitigating circumstance relating to his "misuse or abuse" of drugs. The testimony of his probation and parole officer that defendant refused assistance for and denied having a substance abuse problem was clearly admissible to rebut these mitigating circumstances.

Accordingly, defendant's assignments of error to the admission of this evidence are overruled.

## VIII.

[12] In his next assignment of error, defendant contends that the trial court erred by permitting the State, over defendant's objection, to cross-examine Dr. Borgman "well beyond the scope of the direct examination." We disagree.

On cross-examination, the State questioned Dr. Borgman's opinion regarding defendant's ability to sustain an erection on the night of Amelia's murder, pointing out that he had pled guilty to raping another victim on the same evening. The State questioned Dr. Borgman concerning defendant's earlier expulsion from school, his disciplinary problems as a teenager, his 1981 robbery conviction and his rejection as a teenager of several attempts to alter his behavior. This cross-examination was essentially for the purpose of challenging

Dr. Borgman's opinion that even though defendant had been diagnosed as a teenager as being a Willie-M child prone to uncontrollable violence, on the night of Amelia's murder, he suffered from drug and alcohol abuse.

Evidence Rule 611(b) provides: "A witness may be cross-examined on any matter relevant to any issue in the case, including credibility." N.C.G.S. § 8C-1, Rule 611(b). Defendant refers us to no authorities which would support his position that the State's cross-examination was improper. We conclude his argument that it injected "irrelevant character evidence into the case to the prejudice of defendant's rights" is feckless. We further conclude the cross-examination was altogether proper.

Defendant's assignment of error is overruled.

IX.

**[13]** In his next assignment of error, defendant contends the trial court erred by submitting to the jury the aggravating circumstance that the crime was especially heinous, atrocious, or cruel. N.C.G.S. § 15A-2000(e)(9).

We have discussed the considerations for submitting the heinous, atrocious, or cruel aggravating circumstance to the jury:

[T]his aggravating circumstance is appropriate when the level of brutality involved exceeds that normally found in first-degree murders or when the murder in question is conscienceless, pitiless or unnecessarily torturous to the victim. It also arises when the killing demonstrates an unusual depravity of mind on the part of the defendant.

*State v. Artis*, 325 N.C. 278, 316-17, 384 S.E.2d 470, 492 (1989) (citations omitted), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991). This Court has identified two types of murders which meet the above criteria: "(1) those that are physically agonizing or otherwise dehumanizing to the victim, and (2) those that are less violent but involve the infliction of psychological torture." *Id.* at 317, 384 S.E.2d at 492.

Defendant contends that the facts of this case do not support a finding that this murder was excessively brutal, physically agonizing, dehumanizing or involved any psychological suffering. We disagree.

**STATE v. CARTER**

[338 N.C. 569 (1994)]

In determining if there is sufficient evidence to submit a particular aggravating circumstance to the jury, the trial court must consider the evidence in the light most favorable to the State. *State v. Moose*, 310 N.C. 482, 313 S.E.2d 507 (1984). Here, the State's evidence showed that defendant ripped off Amelia Lewis's pants on a cold night in December in a back alley and covered her body with abrasions and lacerations as she struggled against him. Amelia called out numerous times to defendant, "please don't kill me, I will do anything if you don't kill me." Defendant silenced her by squeezing his hands around her neck. Amelia fought for some time, desperately trying to remove his hands, digging her nails into her own skin, to no avail. Amelia struggled for at least two minutes, with defendant's hands pressed firmly around her neck, before losing consciousness. Death from manual strangulation would have taken at least four minutes. Defendant was not satisfied with the expedience of her death, so he pounded her in the head several times with a brick.

We believe that this evidence, when viewed in the light most favorable to the State, was sufficient to support an inference that the murder was physically agonizing or otherwise dehumanizing to the victim. Furthermore, the facts of this case support an inference that the murder involved the infliction of psychological torture. Therefore, we hold that based on the facts before us, there was sufficient evidence to submit this aggravating circumstance for jury consideration. This assignment of error is overruled.

X.

[14] Defendant next contends the trial court erred in submitting to the jury both the aggravating circumstance that defendant engaged in a course of conduct including other violent crimes, N.C.G.S. § 15A-2000(e)(1), and that the murder was committed during the course of an attempted rape, N.C.G.S. § 15A-2000(e)(5). His argument seems to be that it was not made clear to the jury whether the course of conduct aggravating circumstance was based on the rape of Kesha Davis or the attempted rape of the murder victim, Amelia Lewis. Since the same evidence cannot be used to support more than one aggravating circumstance, *State v. Quesinberry*, 319 N.C. 228, 354 S.E.2d 446 (1987), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 328 N.C. 288, 401 S.E.2d 632 (1991); *State v. Goodman*, 298 N.C. 1, 257 S.E.2d 569 (1979), the course of conduct aggravating circumstance should not have been submitted or, at least, it was erroneously submitted.

This argument has no merit because we are satisfied the jury understood that the course of conduct aggravating circumstance was based solely on the evidence of the rape of Kesha Davis. The trial court instructed the jury on this aggravating circumstance as follows:

> If you find from the evidence and beyond a reasonable doubt . . . that in addition to killing the victim, the defendant on or about the alleged date was engaged in a course of conduct which involved a commission of another crime of violence *against another person* and that these, this or these other crimes were included in the same course of conduct in which the killing of the victim was also a part, you would find this aggravating circumstance . . . .

(Emphasis added.) This instruction made clear to the jury that in finding the course of conduct circumstance, it was to consider a crime of violence committed by defendant "against another person." The crime referred to was against some person other than the murder victim. The only other person against whom defendant committed a crime of violence within the relevant time frame was Kesha Davis.

Further, the other aggravating circumstance, that the murder was committed during the commission of another felony, referred to the other felony as an "attempt to commit rape." Since the felony committed against Kesha Davis was a completed rape and the felony against Amelia Lewis was an attempted rape, the jury must have understood which respective felonies formed the basis of each of the aggravating circumstances submitted.

This assignment of error is overruled.

## XI.

[15] In his next assignment of error, defendant contends that the trial court erred in its submission of the aggravating circumstance that the murder was committed during an attempted rape. N.C.G.S. § 15A-2000(e)(5).

Defendant argues there was insufficient evidence to support this aggravating circumstance. He contends there was no evidence of an initiation of sexual intercourse, forcible or otherwise, between defendant and Amelia Lewis. The only evidence which could support the commission of an attempted rape, defendant contends, is that tending to show the victim was partially disrobed. Defendant concedes he did not make this argument at trial, but that failure does not

absolve the trial court from correctly determining on its own motion whether there is evidence from which the jury could infer the existence of an aggravating circumstance. *State v. McCollum*, 334 N.C. 208, 443 S.E.2d 144 (1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 895, *reh'g denied*, —— U.S. ——, 129 L. Ed. 2d 924 (1994).

This Court in *State v. Harris*, 319 N.C. 383, 354 S.E.2d 222 (1987), dealt with the sufficiency of the evidence to support a conviction of felony murder based on the underlying felony of attempted rape. In *Harris* the victim's body was found on its back with the legs spread apart. The victim's sweatpants had been removed, and the panties were entwined with the sweatpants as if both had been removed at the same time. The victim had multiple stab wounds, and the defendant's clothes had blood of the same type as the victim on them. This Court found that there was sufficient evidence to sustain a conviction for felony murder based on attempted rape.

*State v. McDougall*, 308 N.C. 1, 301 S.E.2d 308, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983), is another case where this Court looked at the sufficiency of the evidence to support a conviction of felony murder based on the underlying felony of attempted rape. In *McDougall*, the victim's body was found on its back with the legs spread wide, her feet nearly up to her buttocks, knees raised and apart, and the victim's nightgown drawn up to her upper chest, exposing her left breast. Many of the wounds had been inflicted while the victim was in a prone position. Shortly after the body was discovered, the defendant was arrested and found to have blood on his clothes which was of the same type as that of the victim. This Court held there was sufficient evidence to survive a motion for nonsuit on the theory of murder during an attempted rape.

The facts in this case are similar to the facts in both *Harris* and *McDougall*. When Amelia's body was discovered, her left pant leg was completely off, her panties were down and her brassiere was above her breasts. Amelia had multiple abrasions and lacerations. The clothes of the defendant had blood on them of the same type as that of the victim. In addition, there was evidence that shortly after defendant murdered Amelia Lewis he raped Kesha Davis. This fact in addition to those which are similar to the facts in *Harris* and *McDougall* lead us to conclude the evidence here is sufficient to support the inferences that the defendant knocked Amelia Lewis to the ground and forcibly removed her pants and panties in an attempt to rape her. Thus, we conclude the evidence in this case supports the

submission of the aggravating circumstance that the murder was committed during the course of an attempted rape.

Defendant's assignment of error on this ground is overruled.

## XII.

Next, defendant contends the trial court erred in submitting this case to the jury for sentencing since the evidence was insufficient to show that any aggravating circumstance existed. Based on the conclusions we reached in sections IX, X and XI above, this argument has no merit. Therefore, we overrule this assignment of error.

## XIII.

[16] In his next assignment of error, defendant argues that the North Carolina death penalty statute, N.C.G.S. § 15A-2000, is unconstitutional in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article I, Sections 19 and 27 of the North Carolina Constitution. Defendant maintains that the North Carolina death penalty statute is imposed in a discriminatory manner, is vague and overbroad, and involves subjective discretion.

Defendant recognizes that this Court has recently reaffirmed that the North Carolina death penalty statute is neither unconstitutionally vague nor overbroad and is not applied in a discriminatory and discretionary manner. *State v. Roper*, 328 N.C. 337, 402 S.E.2d 600, *cert. denied,* —— U.S. ——, 116 L. Ed. 2d 232 (1991). After considering the arguments by defendant on this issue, we continue to adhere to our previous decisions and overrule this assignment of error.

## XIV.

[17] In his next assignment of error, defendant contends that the trial court erred in instructing the jury that it "may" rather than "must" consider any mitigating circumstances found by the jury. In this case the trial court instructed the jury in Issue Three as follows:

> Do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found is, or are, insufficient to outweigh the aggravating circumstance or circumstances found by you?

> If you find from the evidence one or more mitigating circumstances, you must weigh the aggravating circumstances against the mitigating circumstances. *In deciding this issue, each juror may consider any mitigating circumstance or circumstances*

*that the juror determined to exist by a preponderance of the evidence in Issue Two.* In so doing, you are the sole judges of the weight to be given to any individual circumstance which you find, whether aggravating or mitigating. You should not merely add up the number of aggravating circumstances and mitigating circumstances, but rather you must decide from all the evidence what value to give each circumstance, and weigh the aggravating circumstances so valued against the mitigating circumstances so valued, and finally determine whether the mitigating circumstances are · insufficient to outweigh the aggravating circumstances.

If you unanimously find beyond a reasonable doubt that the mitigating circumstances found are insufficient to outweigh the aggravating circumstances found, you would answer Issue Three "yes." If you do not so find or if you have a reasonable doubt as to whether they do, you would answer Issue Three "no." If you answer Issue Three "no," it would be your duty to recommend that the defendant be. sentenced to life imprisonment. If you answer Issue Three "yes," you must then move to consider Issue Number Four.

(Emphasis added.) The defendant assigns error to the above italicized language.

Defendant argues that this instruction allowed the jurors to ignore the mitigating circumstances they found. As a result, defendant argues, the instruction violated the Eighth Amendment. We have recently addressed and rejected arguments identical to those made by defendant in support of this assignment of error. *State v. Green*, 336 N.C. 142, 443 S.E.2d 14, *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 1994 WL 557502 (1994); *State v. Lee*, 335 N.C. 244, 439 S.E.2d 547, *cert. denied*, ——, U.S. ——, —— L. Ed. 2d ——, 63 USLW 3264, *reh'g denied*, ——, U.S. ——, —— L. Ed. 2d ——, 1994 WL 662807 (1994). Thus, this assignment of error is without merit and is overruled.

## Proportionality

## XV.

[18] Having found no error in the guilt and sentencing phases of defendant's trial, we now consider the duties reserved by N.C.G.S. § 15A-2000(d)(2) exclusively for this Court in capital cases. We have thoroughly examined the record on appeal, transcripts, briefs, and oral arguments of counsel in the present case. We conclude the

record supports the jury's finding of the following three aggravating circumstances: (i) that the murder was committed while the defendant was attempting to commit rape, N.C.G.S. § 15A-2000(e)(5); (ii) that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and (iii) that the defendant engaged in a course of conduct involving other violent crimes, N.C.G.S. § 15A-2000(e)(11). Further, we find no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We thus turn to our final statutory duty of determining whether the death sentence imposed here " 'is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.' " *State v. Green*, 336 N.C. 142, 194, 443 S.E.2d 14, 44 (1994) (quoting *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983)); N.C.G.S. § 15A-2000(d)(2).

This Court has said:

"In essence, our task on proportionality review is to compare the case at bar with other cases in the pool which are roughly similar with regard to the crime and the defendant, such as, for example, the manner in which the crime was committed and the defendant's character, background, and physical and mental condition."

*State v. McCollum*, 334 N.C. 208, 239, 433 S.E.2d 144, 161 (quoting *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985)).

The pool of cases that this Court uses for comparative purposes consists of:

"*all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time."

*State v. Syriani*, 333 N.C. 350, 400, 428 S.E.2d 118, 146 (quoting *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983)), *cert. denied*, —— U.S. ——, 126 L. Ed. 2d 341 (1993), *reh'g denied*, —— U.S. ——, 126 L. Ed. 2d 707 (1994). The pool, however, includes only those cases which have been affirmed by this Court. *State v. Stokes*, 319 N.C. 1, 19-20, 352 S.E.2d 653, 663 (1987). In *State*

*v. Bacon*, 337 N.C. 66, 446 S.E.2d 542 (1994), this Court clarified the composition of the pool so that it reflects post-conviction relief awarded to death-sentenced defendants:

> Because the "proportionality pool" is limited to cases involving first-degree murder convictions, a post-conviction proceeding which holds that the State may not prosecute the defendant for first-degree murder or results in a retrial at which the defendant is acquitted or found guilty of a lesser included offense results in the removal of that case from the "pool." When a post-conviction proceeding results in a new capital trial or sentencing proceeding, which, in turn, results in a life sentence for a "death-eligible" defendant, the case is treated as a "life" case for purposes of proportionality review. The case of a defendant sentenced to life imprisonment at a resentencing proceeding ordered in a post-conviction proceeding is similarly treated. Finally, the case of a defendant who is either convicted of first-degree murder and sentenced to death at a new trial or sentenced to death in a resentencing proceeding ordered in a post-conviction proceeding, which sentence is subsequently affirmed by this Court, is treated as a "death-affirmed" case.

*Id.* at 107, 446 S.E.2d at 564. Moreover, this Court has resolved timing issues relating to post-conviction relief: "[A] conviction and death sentence affirmed on direct appeal is presumed to be without error, and . . . a post-conviction decision granting relief to a convicted first-degree murderer is not final until the State has exhausted all available appellate remedies." *Id.* at 107 n.6, 446 S.E.2d at 564 n.6.

While only cases found to be free from error in both phases of the trial are included in the pool, the Court is not required to discuss every case in the pool of similar cases. *State v. Syriani*, 333 N.C. at 400, 428 S.E.2d at 146.

In the present case defendant was convicted of first-degree murder under the theory of premeditation and deliberation and the theory of felony murder. The jury found the following three aggravating circumstances: (i) that the murder was committed while the defendant was attempting to commit rape, N.C.G.S. § 15A-2000(e)(5); (ii) that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and (iii) that the defendant engaged in a course of conduct involving other violent crimes, N.C.G.S. § 15A-2000(e)(11). The jury considered sixteen mitigating circumstances and rejected

fifteen. One or more jurors found a single nonstatutory mitigating circumstance, that the defendant admitted to prior criminal offenses.

This Court has held the sentence of death to be disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). Of these seven cases, only two involved the especially heinous, atrocious, or cruel aggravating circumstance, *State v. Stokes* and *State v. Bondurant*. Furthermore, only one case involved the course of conduct involving other violent crimes aggravating circumstance, *State v. Rogers*. Each of those cases is distinguishable from the present case.

In *Stokes*, the defendant was convicted of first-degree murder solely on the theory of felony murder; whereas, here defendant was convicted on both the theories of felony murder and of premeditation and deliberation. The jury in *Stokes* found only one aggravating circumstance, yet the jury here found three aggravating circumstances. Additionally, in *Stokes* the accomplice in the crime was not sentenced to death, although both "committed the same crime in the same manner." *Stokes*, 319 N.C. at 21, 352 S.E.2d at 644. In the present case defendant acted alone.

In *Bondurant*, the defendant shot the victim but then immediately directed the driver to proceed to the emergency room of the local hospital. In deciding that the death penalty was disproportionate there, we noted that defendant did not kill the victim in the perpetration of another felony, that he did not coldly calculate the commission of the crime for a long period of time, and that it was not a torturous murder. *Bondurant*, 309 N.C. at 693, 309 S.E.2d at 182. Furthermore, we found it significant that "immediately after he shot the victim, [defendant] exhibited a concern for [the victim's] life and remorse for his action by directing the driver of the automobile to the hospital." *Id.* at 694, 309 S.E.2d at 182. In this case, defendant deliberately set out to rape the victim, and when she struggled against him, he silenced her by squeezing his hands around her neck. The victim fought to remove defendant's hands. He pounded her in the head with a brick. Defendant then left his victim partially disrobed on a cold night in December in a back alley. Also, in *Bondurant* the jury found

only one aggravating circumstance; whereas, three aggravating circumstances were found in this case.

In *Rogers*, the only aggravating circumstance that the jury found was that the killing was part of a course of conduct which included the commission of other crimes of violence against other persons. This Court emphasized that those cases in which the death penalty was imposed on this circumstance alone involved facts considerably more egregious than those in *Rogers*. Here, the jury found that aggravating circumstance and two others.

Of the remaining four cases, *Young* is the only one in which the jury found multiple aggravating circumstances. In ruling that the death penalty was disproportionate, this Court focused on the jury's failure to find either that the murder was part of a course of conduct which included the commission of other crimes of violence against other persons or that the crime was especially heinous, atrocious, or cruel. *McCollum*, 334 N.C. at 241, 433 S.E.2d at 162 (citing *Young*, 312 N.C. 669, 325 S.E.2d 181). Unlike *Young*, the jury here found both of these circumstances.

Defendant characterizes this case as typical of those involving sexual assault and a killing. As support for the proposition that his sentence of death is disproportionate, defendant relies on four such cases in which the jury recommended life sentences. *State v. McKinnon*, 328 N.C. 668, 403 S.E.2d 474 (1991); *State v. Harris*, 319 N.C. 383, 354 S.E.2d 222 (1987); *State v. Fincher*, 309 N.C. 1, 305 S.E.2d 685 (1983); *State v. Franklin*, 308 N.C. 682, 304 S.E.2d 579 (1983).

Just because juries in the past "have returned recommendations of life imprisonment in cases similar to the one under review does not automatically establish that juries have 'consistently' returned life sentences in factually similar cases." *Green*, 336 N.C. at 198, 443 S.E.2d at 47. In every proportionality review, this Court independently considers "the individual defendant and the nature of the crime or crimes which he has committed." *State v. Pinch*, 306 N.C. 1, 36, 292 S.E.2d 203, 229, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled on other grounds by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517, *and by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994). We find the facts and circumstances of all four life cases cited above distinguishable from the present case.

All of those cases differ significantly from this case with respect to the nature of the crime, as reflected by specific jury findings. In *McKinnon*, *Harris* and *Fincher*, the defendants were convicted solely upon the felony murder theory. In *Franklin*, the defendant was convicted solely upon premeditated and deliberated murder. Here, defendant was convicted on theories of *both* felony murder and premeditated and deliberated murder. In addition, the juries in those cases found the existence of only one aggravating circumstance. Here, the jury found the existence of three aggravating circumstances.

For the foregoing reasons, we find no significant similarity between this case and each of the cases relied upon by the defendant in which the jury recommended life imprisonment.

We also compare this case with the cases in which we have found the death penalty to be proportionate. Although we review all of the cases in the pool when engaging in our statutorily mandated duty of proportionality review, we reemphasize here "that we will not undertake to discuss or cite all of those cases each time we carry out that duty." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. We conclude the present case is more similar to certain cases in which the jury found either the especially heinous, atrocious or cruel aggravating circumstance or the course of conduct aggravating circumstance. *See, e.g.*, *State v. Vereen*, 312 N.C. 499, 324 S.E.2d 250, *cert. denied*, 471 U.S. 1094, 85 L. Ed. 2d 526 (1985); *State v. McDougall*, 308 N.C. 1, 301 S.E.2d 308 (1983); *State v. Smith*, 305 N.C. 691, 292 S.E.2d 264, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983); *State v. Rook*, 304 N.C. 201, 283 S.E.2d 732 (1981), *cert. denied*, 455 U.S. 1038, 72 L. Ed. 2d 155 (1982). This Court affirmed death sentences in all of the cited cases.

For the foregoing reasons, we conclude this case is similar to those cases in which we have affirmed the death penalty, dissimilar to those cases in which we have held the death penalty to be disproportionate and those in which juries have recommended life sentences. The sentence of death here, therefore, is not disproportionate.

We hold that defendant's trial and sentencing proceeding were free from prejudicial error and the sentence of death is not disproportionate. The result is

NO ERROR.

**STATE v. CARTER**

[338 N.C. 569 (1994)]

Justice MITCHELL concurring in the result.

I concur in the result reached by the majority. I disagree, however, with the conclusion of the majority, relying upon *State v. Silhan,* 302 N.C. 223, 273, 275 S.E.2d 450, 484 (1981), that evidence of a defendant's bad character may not be introduced in a capital sentencing proceeding unless and until it is offered in rebuttal of evidence introduced by the defendant tending to show his good character.

It should be kept firmly in mind here that we are discussing a capital *sentencing proceeding,* rather than the determination of guilt. The constitutional purpose of a capital sentencing proceeding is to determine the proper sentence to be imposed in light of the particular circumstances of the crime committed and the *particular characteristics of the defendant. See, e.g., Lockett v. Ohio,* 438 U.S. 586, 602-603, 57 L. Ed. 2d 973, 988-89 (1978) (as a matter of due process, the sentencer must have the "fullest information possible concerning the defendant's life and characteristics, which are highly relevant 'if not essential [to the] selection of an appropriate sentence. . . .' "). For this reason, in a case decided subsequent to *Silhan,* we quoted with approval the following language from the Supreme Court of Florida indicating that the State's evidence tending to show the life and characteristics of a defendant is always relevant and admissible,

> "[B]ecause we believe the purpose for considering aggravating and mitigating circumstances is to engage in a character analysis of the defendant to ascertain whether the ultimate penalty is called for in his or her particular case. Propensity to commit violent crimes surely must be a valid consideration for the jury and the judge. It is matter that can contribute to decisions as to sentence which will lead to uniform treatment and help eliminate 'total arbitrariness and capriciousness in [the] imposition' of the death penalty. (Citation omitted.)"

*State v. Taylor,* 304 N.C. 249, 280, 283 S.E.2d 761, 780-81 (1981), *cert. denied,* 463 U.S. 1213, 77 L. Ed. 2d 1398 (1983) (quoting *Elledge v. State,* 346 So. 2d 998, 1001 (Fla. 1977)).

I believe that under *Lockett* the evidence of the defendant's bad character was admissible for purposes of the *sentencing proceeding* in this case. I also think it is clear that this is exactly the result the General Assembly of North Carolina intended when it expressly and specifically provided in the clearest English possible that the North

Carolina Rules of Evidence, as set forth in Chapter 8C of the General Statutes of North Carolina, *do not apply in sentencing proceedings.* N.C.G.S. § 8C-1, Rule 1101(b)(3) (1992). *See* N.C.G.S. § 15A-2000(a)(3) (1988) (any evidence the court deems relevant to sentence may be introduced). Therefore, I disagree with the conclusion of the majority that evidence of a defendant's bad character is not generally admissible in a capital *sentencing proceeding.* I believe that such evidence is generally admissible in any sentencing proceeding and may be considered by the jury for all sentencing purposes.

As I am unable to join the reasoning of the majority in this opinion, I concur in the result only.

Justices MEYER and PARKER join in this concurring opinion.