IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-677

Filed 18 March 2026

Union County, Nos. 24JA000157-890, 24JA000158-890, 24JA000159-890

IN THE MATTER OF: P.G., O.G., H.G.

Appeal by respondent-mother from orders entered 21 March 2025, 25 April 2025, and 8 May 2025 by Judge Erin S. Hucks in Union County District Court. Heard in the Court of Appeals 11 February 2026.

*Marc S. Gentile for petitioner-appellee Union County Division of Social Services.*

*Womble Bond Dickinson (US) LLP, by Cal Adams and Reid C. Adams, Jr., for appellee Guardian ad Litem.*

*Parent Defender Annick Lenoir-Peek, by Sr. Assistant Parent Defender J. Lee Gilliam for respondent-appellant mother.*

FREEMAN, Judge.

Respondent-mother appeals from the trial court's adjudication order adjudicating her children as neglected juveniles; disposition order awarding legal and physical custody of the children to their father; and order terminating juvenile court jurisdiction and establishing a civil file. Respondent-mother's arguments on appeal are limited to the adjudication order. She challenges various findings of fact and the conclusion of law adjudicating the children as neglected juveniles. After careful review, we affirm the orders of the trial court.

## I.   Factual and Procedural Background

The evidence presented at the adjudication and disposition hearings tended to show the following.  Respondent-parents share three children: H.G. ("Harry"), O.G., ("Oscar"), and P.G. ("Perry").[1]  Respondent-parents have a history of domestic violence.  In April 2024, respondent-father moved out of the family home in Wingate, North Carolina, following criminal charges related to alleged domestic violence. Respondent-parents agreed that respondent-father could visit the children at the home.  On 14 May 2024, an ex parte Domestic Violence Order of Protection ("DVPO") was entered but was subsequently dismissed on 6 June 2024.  Similarly, the criminal domestic violence charges against respondent-father were dismissed on 4 December 2024.

Respondent-mother has "various mental health diagnoses, including ADHD, PTSD, and anxiety and has been prescribed medications to treat her diagnoses."

### A. August 2024

On 9 August 2024, respondent-mother went to a neighbor's house around 10:00 p.m. or 11:00 p.m. to confront the neighbors about them taking one of the children's Hot Wheels tracks.  Ultimately this interaction led to respondent-mother calling the police.  Respondent-mother testified that she "might have had one drink around dinner time" that evening. Sierra Ritz, who was a "new friend" of respondent-mother,

---

[1] Pseudonyms are used to protect the identities of the minor children.  *See* N.C. R. App. P. 42(b).

testified that she watched the children while respondent-mother was confronting the neighbors.

On 12 August 2024, Detective Sergeant Jake Henry of the Wingate Police Department responded to a call at the home. When he arrived, he saw respondent-father standing in the driveway and holding Oscar, who was then two years old. Respondent-father told Detective Henry he had been talking on the phone with his mother when respondent-mother "became irate and ripped the phone from his hands." Detective Henry asked respondent-father if he thought respondent-mother had consumed alcohol, and respondent-father said that it was possible and "always could be in question."

Detective Henry entered the home and saw respondent-mother sitting on the staircase. Detective Henry noticed that respondent-mother seemed "very agitated," and was confused about his identity; she mistook him for another officer "numerous times throughout the interaction." Respondent-mother told Detective Henry that she had consumed half of a bottle of wine that evening, and Detective Henry noticed that she smelled like alcohol. Respondent-mother denied grabbing the phone out of respondent-father's hands. Detective Henry testified that to his knowledge Harry "was present when the incident happened that caused [respondent-father] . . . to call the police."

Detective Henry saw four-year-old Harry running in and out of the house. Detective Henry asked Harry about the incident, and Harry said, "She's lying. She's

always lying." Respondent-mother told Detective Henry that the youngest child, eight-month-old Perry, was asleep in a crib upstairs. However, another officer found Perry "downstairs in the playpen."

Detective Henry was concerned about respondent-mother's ability to care for the children and asked if respondent-father could take care of the children for the night; respondent-father said that he could not because he could not fit three car seats in his pickup truck, and he was staying at a hotel for the night. Respondent-father then left the residence. Two of respondent-mother's friends later came to the house and told Detective Henry that they would stay at the house for the night and take care of the children. Detective Henry then left, though he "would have taken other action" had respondent-mother's friends not told him that they would stay.

Ritz was one of the friends who came over to the home on the night of 12 August. Ritz testified that she left the house after Oscar and Perry were asleep, and as Harry was "falling asleep on the couch." She further testified that she left before the other friend did. Ritz said that that she did not go to respondent-mother's house that night to care for the children, but to spend time with respondent-mother. Ritz also testified that she did not think that respondent-mother was drunk on the night of 12 August, but respondent-mother told her that she "had taken some anxiety medicine" at some point that day. Ritz characterized respondent-mother as seeming "lost" or "confused" that evening.

That same day, the Union County Division of Social Services ("DSS") received

a report about concerns of "substance abuse, improper supervision, [and] injurious environment" stemming from respondent-mother's apparent intoxication while her children were with her. DSS assigned Opal Phillips to be the social worker for the case, and she went to the home around 10:00 a.m. on 13 August 2024. When she arrived, respondent-mother and two of the children were present. Respondent-mother let Phillips into the house after "several minutes," and was initially "cooperative" and "polite." Respondent-mother told Phillips that she drank three cocktails the night before, "which consisted of soda water, vodka, and juice."

Phillips then discussed putting a safety plan in place, which involved "a sober caretaker in the home because of the . . . allegations the night before." Respondent-mother called her friend, Cameron, who said that respondent-mother could come to her home while respondent-father stayed at the home with the children. Phillips testified that respondent-mother then changed her mind and instead wanted to stay at the home with respondent-father and the children. Phillips did not think that was "an appropriate plan" because of the "tension" between the parents, and stepped outside to call respondent-father. Phillips then went back to the door to speak with respondent-mother but discovered that she was "locked out."

Phillips went to a neighbor's house to try to obtain a video about the 9 August incident with respondent-mother, but when she did not make contact with the neighbor, she called her supervisor. Phillips then called respondent-mother to inform her that the door was locked. Respondent-mother answered Phillips' phone call and

stated that she was "on the phone with [her] attorney" and said, "I just changed my mind." Respondent-mother then merged Phillips with her "attorney," who told respondent-mother, "You're not leaving your damn house." Respondent-mother then informed Phillips that she "didn't realize she merged Sierra [Ritz] in," who was her friend and not her attorney. Phillips testified that she tried to explain a safety plan had to be in place, but Ritz kept talking over her. Phillips then ended the call and contacted her supervisor and law enforcement.

Once respondent-father, who had picked up the third child from school, and law enforcement officers arrived at the home, Phillips and the officers knocked on the door. Respondent-mother answered but seemed "aggravated" and was "walking back and forth." The officers administered a breathalyzer test, around 2:00 or 2:30 p.m., which showed a positive reading. Respondent-mother maintained that she had just brushed her teeth and used mouthwash.

Respondent-mother then walked out of the house while holding one child, while the other "came out running towards" respondent-father. Respondent-mother handed the child she was holding to respondent-father. By her own account, respondent-mother was initially cooperative in giving the children to respondent-father but then was "screaming and upset" and "not okay" with her children leaving. Phillips testified that respondent-mother went back into the house, and went to an upstairs window, and started yelling and "cursing [Phillips] and the officer out[.]" Phillips then made a safety plan with respondent-father.

On 14 August 2024, respondent-parents and the children's maternal and paternal grandmothers met at DSS to continue safety planning, but the group did not agree to a safety plan. At the time the meeting took place, Phillips had no concerns with respondent-father's ability to "protect" the children.

On 16 August 2024, DSS filed petitions alleging that Harry, Oscar, and Perry were neglected juveniles. The petitions detailed DSS' concerns based on respondent-mother's mental health and substance abuse, and domestic violence between respondent-parents. DSS obtained nonsecure custody of the children the same day.[2]

## B. Subsequent Proceedings and Involvement with DSS

DSS also assigned social worker Janie Lakeman as the supervisor on the case. Lakeman and another social worker, Elizabeth Yopp, met with respondent-mother in the following months to discuss respondent-mother's mental health appointments. Lakeman testified that those conversations tended to "escalate quickly," and were not successful in addressing respondent-mother's mental health. Many of the conversations felt like "repeat conversations" to Lakeman, like respondent-mother was not listening to the answers because Lakeman was "not giving her the answer she want[ed]." When Lakeman discussed her concerns about respondent-mother's mental health and offered resources, respondent-mother's responses were "usually sarcastic."

---

[2] The children were placed with respondent-father on 6 November 2024. They remained in respondent-father's care throughout the proceedings.

Respondent-mother also sent hundreds of text messages, often containing profanity, to Lakeman, which alleged "accusations against DSS as a whole, the social worker, [Lakeman], the director, the executive director, the Court[,]" and accused "DSS of grooming [the] children to be trafficked."

During the subsequent proceedings, respondent-mother was represented by multiple attorneys who withdrew for various reasons, including "irreconcilable differences." The adjudication hearing was scheduled for 6 November 2024 but was continued to 3 December 2024 at the request of DSS. The proceeding began to take place on 3 December and 4 December, but was continued to 30 December 2024, as respondent-mother "appeared to be passed out or asleep at various times" during the proceedings. Respondent-mother did not appear at the 30 December adjudication hearing, and it was again continued to 29 January 2025.

On 31 December 2024, respondent-mother went to the DSS office, "skipped the lobby" and "attempted to gain access to a restricted area" where "[DSS] normally wouldn't see a client." When approached by a DSS employee, respondent-mother initially said she was a social worker in Mecklenburg County. Later that same day, she went to the home where respondent-father was staying with the children and "was banging on the doors and windows" while respondent-father and the children were present. Law enforcement subsequently escorted respondent-mother away from the property.

**C. January 2025**

On 9 January 2025, respondent-mother was arrested for trespassing and resisting a public officer after she went to the DSS office without an appointment and refused to leave when informed that no one was available to speak with her, despite being requested to leave by DSS security.

On 13 January 2025, Detective Henry responded to a 911 call at respondent-father's house, and found respondent-mother at the property. Detective Henry testified that respondent-mother "started breaking the garage door window" and was talking to the children "from the ground to the upstairs window." Respondent-mother got in her car and started driving towards the garage door, so Detective Henry stopped her. Respondent-mother then "got up on the hood of her car and jumped through the open glass that she had broken out the rest of the way into the garage." Respondent-mother started knocking on the interior door to the home. Respondent-father came outside with the children to leave the home, and while he was putting one of the children in their car seat, respondent-mother took the other two children "and went behind the house." Law enforcement eventually "convinced her to give the kids back to [respondent-father]."

DSS filed a motion to appoint a Rule 17 Guardian ad Litem ("GAL") for respondent-mother on 17 January 2025; the trial court subsequently granted the motion over respondent-mother's objection.

On 29 January 2025, the trial court ordered a mistrial of adjudication and scheduled a new adjudication hearing for 24 February 2025.

**D. Adjudication Hearing**

At the 24 February adjudication hearing, Lakeman further testified about incidents of domestic violence between the respondent-parents in 2023 and 2024. Respondent-mother objected to this testimony on the basis that Lakeman's testimony stemmed from statements made by respondent-mother after the petition was filed, as they were made during the previous adjudication hearing on 3 December 2024. The trial court admitted the testimony as an admission of a party-opponent. Lakeman testified that respondent-mother previously testified about three instances of domestic violence while the children were present: respondent-father breaking the windows in their home in April 2023; respondent-father throwing a wooden table at respondent-mother while she was nine months pregnant in late 2023; and respondent-father ripping off a baby gate from the wall and throwing it at respondent-mother in the spring of 2024. Lakeman also testified that respondent-mother said respondent-father pushed her down while she was holding one of the children. Respondent-mother's testimony contradicted Lakeman's when she stated that the children were not present during the April 2023 incident but were asleep in different parts of the house.

Lakeman further testified that respondent-mother's last mental health appointment was in November 2024, and to her knowledge respondent-mother was not being treated for her mental health. Lakeman also testified, over counsel's objection, that respondent-mother had not entered into a family service agreement.

Respondent-mother testified about her mental health. Respondent-mother maintained that her mental health diagnoses were "well-managed" with a "low dose medication." Respondent-mother specified that in August 2024, she was prescribed "Vyvanse as needed" and "lorazepam, 0.25 as needed" but was not taking daily medications. She testified that the Center for Emotional Health recommended that she engage in therapy and that she had been on a waitlist. However, she testified that she was currently seeing a therapist.

Respondent-mother also testified to her version of the events of 12 and 13 August. She maintained that on the night of 12 August, her friends were at her home when she went to bed, and the children "laid down someplace and fell asleep." Respondent-mother further testified that her friends were gone when she woke up, and she did not know when they left.

Respondent-mother testified that when she met with Phillips on 13 August 2024 at her house, the first safety plan to stay with her friend Cameron was called off because Cameron was "going to need daycare" for her child, and Phillips responded, "Well, we're not giving her no daycare, so this isn't going to work." Respondent-mother testified that after Phillips stepped outside, she thought they were "done for the day" and "on the same page," though Phillips still had "some concerns." Respondent-mother then had pizza and wine and thought it was "an hour-and a half, two hours" before Phillips and law enforcement returned.

Respondent-mother testified that she had "two glasses of wine that day," and

she drank a glass half an hour before the breathalyzer was administered. She told the police the positive reading was from mouthwash because she was "nervous to admit that [she] had two glasses of wine that day . . . ."

Respondent-father testified that in his opinion, respondent mother was a "decent" parent when she was "sober" or in a "right frame of mind," "mentally and emotionally." Respondent-father also testified that he was concerned about respondent-mother's substance abuse, which included alcohol and prescription pills.

On 21 March 2025, the trial court entered its written order adjudicating the children as neglected juveniles.

**E. Disposition Hearing**

The trial court conducted the disposition hearing on 7 April 2025. At the disposition hearing, DSS social worker Elizabeth Yopp testified that respondent-father was progressing on his identified needs, the interactions between him and the children were positive, and that DSS did not have concerns about the children's well-being in his care. Yopp further testified that respondent-mother had "refused" to tell DSS where she was receiving counseling, and that she had received an assessment but had not engaged in further services. Respondent-mother had completed some classes, but they did not satisfy the "parenting requirement that DSS was asking her to do." Yopp also testified that respondent-mother had not confirmed her employment and had last confirmed where she was residing "several months" prior to the disposition hearing.

Yopp testified that during visitation sessions, DSS had a "difficult time at the end in separating [respondent-mother] from the children," causing the visits to "become[ ] chaotic," despite warnings that the session was nearing an end. She also testified about times where they had to instruct respondent-mother to stop whispering to Harry, and respondent-mother had told Harry to "tell his therapist that he wants to go home and live with Mommy" and asked him questions like, "Is daddy being mean to you?" Respondent-mother would bring toys and games to the sessions to play with the children.

The children's GAL testified that he had no concerns with the children's placement with respondent-father, and that he was not concerned with respondent-father's progress. The GAL was concerned with respondent-mother's lack of progress in doing "any of the positive things that the Court has asked her to do or that DSS has asked her to do."

Respondent-mother testified that she was on a waitlist for in-person therapy but had completed two in-person sessions and about five "follow-up" phone calls with BetterHelp in the meantime. Respondent-mother also testified that she was employed and that there was a house "available to [her]" that was suitable for the children, which was where they conducted visits. Respondent-mother testified that she did not want DSS or the trial court to be further involved with her mental health. She further testified that she would be willing to sign a family services agreement "if it meant we're done with involvement with DSS and DSS court." Respondent-mother

testified that respondent-father "weaponized DSS" by making "three bogus 911 calls," and that there was "collusion between . . . the police officers and the judges, and there's just so much corruption and crooked practices going on, misconduct" for the purpose of "foster care fraud."

On 21 April 2025, the trial court entered its written disposition order. The trial court found that respondent-mother made "minimal progress towards addressing her identified needs." The trial court further found that respondent-father had made progress on his identified needs, was employed, maintained communication with DSS and the GAL, and had been meeting the children's needs as their primary caretaker for months. The trial court concluded that it was in the best interest of the children to be reunified with respondent-father and granted him physical and legal custody. The trial court ordered that respondent-mother have supervised visitation, have an updated mental health and substance abuse assessment, engage in counseling and medication management, and follow through with any recommended treatment. On 8 May 2025, the trial court entered its written order terminating juvenile court jurisdiction and established a civil file.

Respondent-mother timely appealed the adjudication, disposition, and jurisdiction termination orders.

## II.    Jurisdiction

Appeal of right lies to this Court from "[a]ny initial order of disposition and the adjudication order upon which it is based[,]" N.C.G.S. § 7B-1001(a)(3) (2025), and

"[f]rom any final judgment of a district court in a civil action[,]" *id.* § 7A-27(b)(2) (2025).

### III.    Standard of Review

"In an appeal from an initial adjudication in a juvenile proceeding, 'the sole question for the reviewing court is whether the trial court's conclusions of law are supported by adequate findings . . . .' " *In re K.E.P.*, 298 N.C. App. 527, 531 (2025) (quoting *In re A.J.*, 386 N.C. 409, 411–12 (2024) (cleaned up)). "The allegations in a petition alleging that a juvenile is abused, neglected, or dependent shall be proved by clear and convincing evidence." N.C.G.S. § 7B-805 (2025). Such findings are "binding on appeal" and "are deemed conclusive, even where some evidence supports contrary findings." *In re K.E.P.*, 298 N.C. App. at 531 (cleaned up).

"[T]he North Carolina Rules of Evidence apply at the adjudication stage of these juvenile proceedings." *In re A.J.*, 386 N.C. at 412. "Assuming an evidentiary objection is properly preserved, a party may argue on appeal that any findings supported solely by inadmissible evidence are infirm and cannot support the trial court's conclusions of law." *Id.*

"Conclusions of law made by the trial court are reviewable de novo on appeal." *In re K.S.*, 380 N.C. 60, 64 (2022). "Under a de novo review, the court considers the matter anew and freely substitutes its own judgment for that of the trial court." *In re T.M.L.*, 377 N.C. 369, 375 (2021) (emphasis omitted) (cleaned up).

### IV.    Discussion

Respondent-mother challenges various findings of fact and the trial court's conclusion of law that the children were neglected juveniles. We address each argument in turn.

## F. Challenged Findings of Fact

Respondent-mother argues that several findings in the adjudication order are unsupported by competent evidence. The challenged findings can be grouped into three categories: (1) findings based on post-petition gathered evidence; (2) findings based on respondent-mother's statements from a prior proceeding that ended in a mistrial; and (3) findings without support of record evidence.

### 1. Post-Petition Evidence

Respondent-mother argues that factual findings 24, 25, 26, 27, 28, 30, 31, 32, and 33 in the adjudication order are unsupported by competent evidence because they rely on evidence gathered after DSS filed the petition. Specifically, respondent-mother contends that post-petition gathered evidence is inadmissible for the purpose of adjudicating a child as neglected. We disagree.

Findings 24, 25, and 26 detail three different mental health assessments and office visits, including respondent-mother's medication plan, alcohol use, and behavior at the appointments. Two of the findings recommend therapy. Finding 27 summarizes that two separate mental health providers recommended that respondent-mother engage in therapy, but respondent-mother had never engaged in therapy. Finding 28 lists several different dates when the Center for Emotional

Health recommended respondent-mother for therapy, and that another mental health provider recommended therapy.

Finding 30 and 31 detail the 13 January incident, where respondent-mother broke into the garage, and state that respondent-mother's behavior during the incident was erratic and not in the best interests of the children. Finding 32 explains that the trial court observed respondent-mother "randomly" exiting the courtroom, and that it observed her engaging in "inappropriate and/or erratic behaviors such talking to herself, setting up framed pictures of the children on the defense table, and making inappropriate gestures while various witnesses were testifying." Finally, finding 33 states, "It is clear to this Court that [respondent-mother's] mental health issues are a fixed and ongoing circumstance which impact her ability to appropriately parent the minor children."

"The adjudicatory hearing shall be a judicial process designed to adjudicate the existence or nonexistence of any of the conditions alleged in a petition." N.C.G.S. § 7B-802 (2025). At the adjudication hearing, the "inquiry focuses on the status of the child at the time the petition is filed, not the post-petition actions of a party." *In re L.N.H.*, 382 N.C. 536, 543 (2022). This is because "the conditions underlying determination of whether a juvenile is an abused, neglected, or dependent juvenile are fixed at the time of the filing of the petition." *Id.* However, this Court has previously determined that some ongoing conditions as alleged in the petition are fixed; therefore, a trial court may consider evidence gathered after the petition was

filed within the meaning of the statutory rule. *See In re G.W.*, 286 N.C. App. 587, 594 (2022).

Conditions "which pertain[ ] to mental illness . . . have been determined by this Court to be fixed and ongoing circumstances so that post-petition evidence about them is allowed to be considered in a neglect adjudication." *Id.* (cleaned up). Put another way, trial courts may use evidence gathered after the petition was filed when the evidence "relate[s] in whole or in part to ongoing circumstances relevant to the existence or nonexistence of conditions alleged in the adjudication petition." *Id.* (cleaned up). Since then, our Supreme Court has upheld a trial court's findings "that respondent exhibited 'extremely hostile and aggressive' behavior and refused to follow through with a recommended case plan to address those issues," including findings that discussed the "extremely hostile and aggressive behavior" of the respondent-parent "in the Courtroom and aggressive comments directed towards other participants," which necessarily occurred *after* the petition was filed. *In re A.J.,* 386 N.C. at 415–16.

Because a panel of this Court has already decided the legal issue of whether evidence gathered post-petition may be used in an adjudication when the evidence relates to an ongoing condition alleged in the petition, and it has not been overturned by a higher court, we are bound to follow that precedent. *See In re Civil Penalty*, 324 N.C. 373, 384 (1989) ("Where a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that

precedent, unless it has been overturned by a higher court."); *see also State v. Gonzalez*, 263 N.C. App. 527, 531 (2019) (stating we must follow binding precedent of this Court "even if the previous panel's decision involved narrowing or distinguishing an earlier controlling precedent—even one from the Supreme Court[.]"). Thus, we must conclude that the trial court properly considered post-petition evidence related to respondent-mother's ongoing mental health condition. Therefore, respondent-mother's challenge to findings 24, 25, 26, 27, 28, 30, 31, 32, and 33 fails, and these factual findings are binding on appeal.

### 2. *Statements from Prior Adjudication Proceedings*

Next, we turn to respondent-mother's challenge to finding of fact 7, which provides "[t]he parents in this matter have engaged in acts of domestic violence in the presence of the minor children."

Respondent-mother maintains that factual finding 7 is unsupported because the only evidence supporting multiple instances of domestic violence in the presence of the children stemmed from respondent-mother's testimony from the "prior adjudication hearing that resulted in a mistrial . . . ." Respondent-mother maintains that because the "new trial was an entirely separate legal affair from the original trial . . . [,] the testimony from the mistrial could not be used to prove independent facts at the retrial."

As an initial matter, this argument is not properly preserved for appellate review. Respondent-mother argued below that the statements were inadmissible

because they were made after the petition was filed, not because they were statements from a proceeding that ended in a mistrial. *See State v. Sharpe*, 344 N.C. 190, 195 (1996) ("[W]here a theory argued on appeal was not raised before the trial court, the law does not permit parties to swap horses between courts in order to get a better mount" on appellate review. (cleaned up)).

But even if this argument were properly preserved, there are circumstances where something is admissible from a prior proceeding ending in a mistrial. "When the trial court declares a mistrial, 'in legal contemplation there has been no trial.' " *State v. Harris*, 198 N.C. App. 371, 376 (2009) (quoting *State v. Sanders*, 347 N.C. 587, 599 (1998)). "There can be no prior binding evidentiary rulings when [a] defendant is tried again following a mistrial." *Id.*; *see also Burchette v. Lynch*, 139 N.C. App. 756, 761 (2000) ("When a trial court orders a new trial, the case remains on the civil docket for the trial de novo, unaffected by the rulings made therein during the original trial . . . ." (cleaned up)). In a subsequent trial, therefore, a "defendant would not be bound by evidence presented at the former trial." *Burchette*, 139 N.C. App. at 761 (cleaned up).

However, this rule is not absolute. *See, e.g., State v. Dial*, 122 N.C. App. 298, 305–06 (1996) (holding a prior court's acceptance of a special verdict was binding in a subsequent trial on the same matter despite the prior trial ending in a mistrial). And it does not exclude testimony from a prior proceeding that ended in a mistrial from being admissible at the subsequent proceeding. In *State v. Carter*, the victim

testified in the defendant's first trial, which ultimately ended in a mistrial. 338 N.C. 569, 583, 590 (1994). The victim was unavailable to testify in defendant's subsequent trial on the same matter. *Id.* at 591. Our Supreme Court held that her prior testimony was admissible in the subsequent trial. *Id.* at 592–93.

Here, as in *Carter*, there is testimony from a prior proceeding—that ended in a mistrial—and was used in a subsequent proceeding involving the same controversy. Like the victim's testimony was admissible in the subsequent trial in *Carter*, respondent-mother's statements from the earlier adjudication proceeding were admissible and therefore constitute competent evidence to support the challenged findings of fact. Though here, these are the statements of a party opponent and not an unavailable witness who testified under oath in a prior proceeding, *compare* N.C.G.S. § 8C-1, Rule 801(d) (2025) (hearsay exception for statements by a party-opponent), *with id.* § 8C-1, Rule 804(b)(1) (2025) (hearsay exception for former testimony), the same general principle applies: the testimony is admissible notwithstanding the earlier mistrial. Accordingly, Lakeman's testimony about respondent-mother's statements from the prior adjudication hearing that ended in a mistrial was properly admitted.

Here, factual finding 7 states that multiple instances of domestic violence happened in the presence of the children. This is supported by Lakeman's testimony, which detailed three separate instances of domestic violence between the respondent-parents and occurred in the presence of the children, and by the testimony about the

January incident, which happened in the presence of the minor children. Therefore, finding 7 is supported by clear and convincing evidence.

### 3. *Other Findings*

The remaining factual findings that respondent-mother has challenged on appeal are findings 10(c), 11(d), 11(e), 11(r), 11(x), 11(z), and 29. These findings state:

> 10. On or about August 9, 2024, [respondent-mother] was at the Respondents' home with the minor children and a friend, Sierra Ritz.
>
> . . . .
>
>> c. [Respondent-mother] had consumed at least three alcoholic beverages.
>
> . . . .
>
> 11. On or about August 12, 2024, there was a domestic violence incident between [respondent-mother] and [respondent-father].
>
> . . . .
>
>> d. The minor children were in the room with [respondent-father] and [respondent-mother].
>>
>> e. [Respondent-mother] grabbed the telephone out of [respondent-father's] hand and threw his phone. [Respondent-father] felt threatened by [respondent-mother's] behavior and called law enforcement officers. This incident occurred in the presence of the minor children.
>>
>> . . . .
>>
>> r. Whether [respondent-mother's] behavior was driven by mental health issues, substance use, or both is unclear to this Court. However, this court

finds that [respondent-mother's] behavior during the August 12, 2024 incident was erratic and not in the best interests of the children, who were present during this incident.

. . . .

x. Ms. Ritz testified that when she left [respondent-mother's] home, [Oscar] and [Perry] were asleep, but that [Harry] and [respondent-mother] were still awake. This contradicts [respondent-mother's] testimony. This Court finds Ms. Ritz's testimony to be reliable. However, this Court questions the veracity of Ms. Smith's testimony.

. . . .

z. Both Ms. Ritz and [respondent-mother's] neighbor left the home, leaving [respondent-mother] without a sober caretaker for the minor that children. This is not in the minor children's best interests.

. . . .

29. Medication management is not sufficient to address the mental health concerns for [respondent-mother] based on testimony and evidence presented as well as this court's observations of [respondent-mother] during court proceedings.

Finding of fact 11(e) is supported to the extent that it details the incident of respondent-mother snatching the cell phone from respondent-father, as Detective Henry and respondent-father's testimonies detailing that respondent-mother "ripped" the phone out of his hand and that respondent-father called 911 "to de-escalate the situation" and "prevent it from going any further." However, this factual finding is unsupported to the extent that it states this incident happened in the

presence of the children, as the record evidence supports that only one child was present when respondent-mother grabbed the cell phone.

Finding of fact 11(r) is supported by Detective Henry's testimony that on the night in question, respondent-mother was "very agitated to a point where it seemed like she was getting offended that [he] was not that officer that she had spoke[n] to before." This finding is also supported by Ritz's testimony that respondent-mother seemed "lost" or "confused" that evening. Respondent-father testified that respondent-mother "erratically came and took something from me out of my hand erratically." Furthermore, all of the children were present for various portions of the overall incident on 12 August, even if they did not all witness the phone being "snatched." Accordingly, finding 11(r) is supported by clear and convincing evidence.

The remaining findings may be unsupported. However, we need not determine whether these findings were supported because they do not affect the conclusion. *See In re J.T.C.*, 273 N.C. App. 66, 68 (2020) ("[E]rroneous findings unnecessary to the determination do not constitute reversible error where the trial court's remaining findings independently support its conclusions of law." (cleaned up)).

**G. Conclusion of Law**

Respondent-mother challenges the trial court's conclusion that adjudicated the children neglected.

The trial court concluded that the children were neglected juveniles as defined by subsection 7B-101(15) of our General Statutes because of lack of "proper care or

supervision to the minor children, and that the parents created or allowed to be created a living environment that is injurious to the juveniles' welfare."

A neglected juvenile is, as relevant here:

> Any juvenile less than 18 years of age . . . whose parent, guardian, or caretaker does any of the following:
>
> a. Does not provide proper care, supervision, or discipline.
>
> . . . .
>
> e. Creates or allows to be created a living environment that is injurious to the juvenile's welfare.

N.C.G.S. § 7B-101(15) (2025). "The clear and convincing evidence in the record must show current circumstances that present a risk to the juvenile." *In re K.C.*, 295 N.C. App. 363, 369 (2024) (cleaned up). "This Court has additionally required that there be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide proper care, supervision, or discipline in order to adjudicate a juvenile neglected." *In re Helms*, 127 N.C. App. 505, 511 (1997) (emphasis omitted) (cleaned up).

"Severe or dangerous conduct or a pattern of conduct either causing injury or potentially causing injury to the juvenile may include alcohol or substance abuse by the parent . . . ." *In re D.B.J.*, 197 N.C. App. 752, 755 (2009) (cleaned up). "Other conduct that supports a conclusion that a child is neglected includes exposing the child to acts of domestic violence, . . . and threatening or abusive behavior toward social workers and police officers in the presence of the children." *Id.* "Mental health

issues, which are a 'fixed and ongoing circumstance,' can lead to an adjudication of neglect." *In re K.C.*, 295 N.C. App. at 369 (quoting *In re G.W.*, 286 N.C. App. at 594). "It is well-established that the trial court need not wait for actual harm to occur to the child if there is a substantial risk of harm to the child in the home." *In re T.S.*, 178 N.C. App. 110, 113 (2006).

Here, as discussed above, the trial court made findings that illustrate multiple instances of domestic violence between the respondent-parents that happened in the presence of the minor children. In particular, factual finding 30, detailing the 13 January 2025 incident, shows respondent-mother trying to break into the house—where the children were—while the children were watching, and that she grabbed two of the children and took them behind the house. Furthermore, factual finding 12 details that on 13 August 2024, respondent-mother locked Phillips out of the house, consumed alcohol, and, in the presence of the children, "began yelling obscenities at the individuals who remained in the front yard, including respondent-father, law enforcement, and Ms. Phillips." There are also many findings—such as factual findings 16, 17, 18, 19, 20, 21, 22, 25, 26, and 28—about respondent-mother's refusal to engage in therapy despite multiple recommendations by her medical providers, and warnings by medical providers about the interaction of her prescribed medications with alcohol or other drugs.

Ultimately, the binding findings of fact show respondent-mother engaging in "threatening or abusive behavior toward social workers and police officers in the

presence of the children," *see In re D.B.J.*, 197 N.C. App. at 755; "exposing children to acts of domestic violence," *see id.*; and the proliferation of her mental health issues, which are a fixed and ongoing concern, *see In re K.C.*, 295 N.C. App. at 369. Accordingly, the trial court's findings support a conclusion of neglect.

## V. Conclusion

For the foregoing reasons, we affirm the orders of the trial court.

AFFIRMED.

Chief Judge DILLON and Judge FLOOD concur.